Appeal from Third District.

## JOHNSON et al. v. GEDDES et al.

No. 2927.   Decided November 24, 1916.   Rehearing denied December 28, 1916 (161 Pac. 910).

1. MINES AND MINERALS—SALE—CONSTRUCTION OF CONTRACT—PAYMENT.   Plaintiff, in 1901, entered into a contract with defendants to sell certain unpatented mining claims and the improvements thereon for $21,000, payable $1,000 on the day of the contract, $1,000 on or before September 2, 1901, $6,000 on or before October 20, 1901, $4,000 on or before July 2, 1902, and the remaining $9,000 payable "only in the manner following and not otherwise," that is, by the payment of a net one-half of the proceeds of all ores mined from the property after deducting the expenses of mining, etc., and providing that the managing and developing of the property should be left solely to the sound and reasonable discretion of the defendants; that plaintiff, when the property was being worked, might have employment under defendant at the usual miner's wages; that on payment of the $12,000 plaintiffs would deliver a warranty deed of title in fee clear of incumbrances, whereupon defendants would deliver an agreement to pay the balance, and that on payment of the first $1,000 the plaintiffs would put the deeds in escrow.   Defendants made the first four payments amounting to $12,000, and did not thereafter operate the mine or obtain any proceeds from ore up to September, 1909, when action for the balance of $9,000 was brought.   *Held*, that plaintiff could not recover, since nothing in the contract obligated the defendants to develop the claims within what any one might consider as reasonable time, and since, there being no proceeds from ore, the balance was not due.[1]   (Page 144.)

2. CONTRACTS—CONSTRUCTION—NECESSITY.   Unless it is shown that a contract was obtained by fraud, oppression, or duress, or that it is against law or public policy, or is unconscionable, it is the duty of the court to enforce it according to its terms, and it may not by forced construction modify or disregard it. (page 144.)

3. EVIDENCE—CONTRACTS—CONTEMPORANEOUS STATEMENTS.   Statements of the parties contemporaneous with the making of their

[1]*Charter Oak, etc.*, v. *Gisborne*, 5 Utah 319, 15 Pac. 253; *McIntyre* v. *Ajax M. Co.*, 20 Utah 323, 60 Pac. 552; *Id.*, 28 Utah 162, 77 Pac. 613; *Haslam* v. *Haslam*, 19 Utah 1, 56 Pac. 243; *Schenck* v. *Wicks*, 23 Utah 576, 65 Pac. 732.

contract for the sale of mining claims could not be given the effect of enlarging liability under the contract. (Page 145.)

4. EVIDENCE—PAROL EVIDENCE—CONTRADICTING TERMS OF CONTRACT. Contemporaneous statements of the parties to a contract for the sale of mining claims, directly contradictory of the terms of their contract, would be given no force where it was neither claimed nor found that they were intended for or constituted a modification of the contract. (Page 145.)

5. CONTRACTS—CONSTRUCTION—INTENTION OF PARTIES. Where the terms of a contract are uncertain or obscure, the court not only may, but should, avail itself of all the legitmate legal evidence appearing upon the intention of the parties and the rights created on the one side and the obligations assumed on the other. (Page 146.)

6. CONTRACTS—MODIFICATION—GROUNDS. Courts of equity, under the guise of construction, may not so change or modify contracts as to impose conditions or obligations not express or clearly implied, though such conditions may make the terms of the contract more equitable and in accord with the court's sense of justice; nor can they give relief merely because parties to a long-time contract did not provide for all possible emergencies. (Page 146.)

7. MINES AND MINERALS—SALE—TERMS OF PAYMENT—SUFFICIENCY OF EVIDENCE. In an action to recover the balance due upon the purchase price of certain mining claims, evidence *held* not to sustain a finding that defendants could have realized net proceeds in any amount between July, 1901, and September, 1909, out of which to pay the balance according to the contract. (Page 150.)

STRAUP, C. J., dissenting.

Appeal from District Court, Third District; *Hon. Geo. G. Armstrong,* Judge.

Action by Silas F. Johnson and another against Theron Geddes and others.

Judgment for plaintiffs. Defendants appeal.

REVERSED AND REMANDED with directions to enter judgment dismissing the complaint.

*Howat, Macmillan & Nebeker* for appellants.

*Wm. H. King* and *Samuel Russell* for respondents.

FRICK, J.

On September 23, 1909, the plaintiffs commenced this action in equity to recover the sum of $9,000 from the defendants as an alleged balance due upon the purchase price of certain mining claims, and to have said sum declared a lien upon said mining claims, and for an order of sale thereof to pay said $9,000, etc. The defendants denied the maturity of the alleged indebtedness, and, as a further defense to the action, set up the contract entered into between the parties concerning the purchase of the mining claims in question, the terms of which, so far as material to this controversy, we shall refer to hereafter. It is not necessary to set forth the pleadings. Such parts as may be deemed material, however, will be referred to in the course of the opinion.

The conceded facts, briefly stated, are, that on the 2d day of July, 1901, the plaintiffs entered into what may be termed a dual option agreement with the defendants whereby the plaintiffs sold to the defendants seven mining claims, of which six were unpatented, together with the improvements thereon. By the terms of said agreement the defendants were given the choice to pay the sum of $16,000 in full for said mining claims or to pay the sum of $21,000, $9,000 of which to be paid as hereinafter stated. If the defendants elected to pay the sum of $16,000 for the full purchase price of said claims, they were required to pay the same as follows: $1,000 on the date of the contract July 2, 1901; $1,000 on or before September 2, 1901; $6,000 on or before October 20, 1901; and the remaining $8,000 on or before July 2, 1902. Upon the other hand, if the defendants elected to pay the $21,000 for said mining claims the payments were to be made at the dates and upon the conditions following: $1,000 on the date of the contract; $1,000 on or before September 2, 1901; $6,000 on or before October 20, 1901; $4,000 on or before July 2, 1902; and the remaining $9,000, in the language of the contract were made payable in the manner and upon the conditions following:

"5. The balance of the above-named purchase price, being the sum of nine thousand dollars ($9,000.00), shall be paid

only in the manner following and not otherwise—that is to say, on and after the 2d day of July, 1902, the said second parties, or their assigns, shall pay over to said first parties, or their assigns, a net one-half ($\frac{1}{2}$) of said second parties' proceeds from said mine, meaning thereby a net one-half ($\frac{1}{2}$) of the proceeds of all ores mined from said property after the said second parties have deducted all moneys paid out by them or expenses incurred in mining, milling, sampling, handling, transporting, smelting and marketing said ores.''

The contract also contained the following conditions:

''E.   The extent and manner of managing and developing said property shall be left solely to the sound and reasonable discretion of said parties of the second part.

''F.   It is also understood and provided that the parties of the first part may have, if they so desire, when the property is being worked, employment thereon under the orders and direction of said second party, or his assigns, so long as said first parties are competent and faithful and said work continues, at usual miners' wages.

''G.   *   *   *   And the parties of the first part agree, upon the payment of the twelve thousand dollars ($12,000.00) as above specified, to deliver to the parties of the second part, or their assigns, a warranty deed containing the usual covenants conveying title in fee to their full undivided interests in the above-described premises free and clear of all incumbrances, and subject only to the paramount title of the United States in the unpatented claims.   Upon delivery of said deed the second parties hereto shall make and deliver to the parties of the first part hereto their certain contract agreement to pay the balance of the purchase price named herein of nine thousand dollars ($9,000.00) in the manner and only in the manner provided by paragraph 5.   And the said parties of the first part further agree that upon the payment of the one thousand dollars ($1,000.00) required, and to-day made, under paragraph No. 1, said deed shall be placed in escrow in Salt Lake City, Utah, to be delivered to the said second parties, or their assigns, upon the payment of the said twelve thousand dollars ($12,000.00).''

The defendants elected to purchase the mining claims for

the sum of $21,000, to be paid, however, in the manner stated in the part of the contract we have set forth above. The defendants made the first four payments amounting to the sum of $12,000, and obtained the deed mentioned in the contract. Upon the delivery of the deed the parties entered into the contract provided for in the original agreement, the material parts of which are:

"In consideration of the conveyance by the second parties to the first parties of the Atlas, Atlas No. 1, Atlas No. 2, Atlas No. 3, Atlas No. 4, Atlas No. 5, and Atlas No. 6, lode mining claims, in Star Mining District, Beaver County, Utah, the first parties hereby promise and agree, for themselves and their assigns, that they will pay to the second parties or their assigns, one-half of the net proceeds of all ores mined by the first parties, or their assigns, from said property, until the second parties shall have received the sum total of $9,000.00 out of such net proceeds. The words 'net proceeds' as hereinabove used shall be construed as the proceeds of the sales of ores taken from said property remaining after the first parties shall have deducted all moneys paid out by them or their assigns for expenses incurred in mining, milling, sampling, handling, transportation, smelting and marketing said ores. This contract shall be deemed and construed as a covenant running with the title to said land and shall bind the grantees, heirs and assigns of the first parties. It is distinctly understood and agreed that the first parties shall not be liable hereunder to pay to the second parties any sum whatever unless such net proceeds are realized by them out of said property, and then only to the extent of one-half of such net proceeds until the full sum of $9,000.00 shall be paid to the second parties."

The plaintiffs, in their complaint, pleaded only the legal effect of the contract, and, among other things, also alleged:

"That said defendants, with full knowledge of the rights of the plaintiffs in the premises, and of their obligation to pay the said $9,000 remaining due upon the purchase price of said property, have wilfully failed, neglected and refused to pay said sum, or any part thereof, out of the proceeds of said mining property, or otherwise, and said defendants with full

knowledge as aforesaid of the rights of the plaintiffs and of their duty in the premises, have wilfully failed, neglected and refused to work, develop or operate said mine, or extract ores therefrom, all for the express purpose of delaying the payment of said $9,000, and of defeating, if possible, the rights of the plaintiffs in the premises. That said defendants have had a reasonble time to pay said $9,000 from the proceeds of said mining property, and have likewise had a reasonable time to develop said property, and to sell and dispose of the same; but to do either of said things said defendants have neglected and refused and still neglect and refuse.''

In support of the foregoing allegations the plaintiffs, over defendants' objections, were permitted to propound the following question and to receive the answer thereto as stated below:

''Mr. Johnson, from your knowledge of the ground and your experience as a mining man, what do you say as to whether or not with but comparatively slight expenditure ore could have been mined and shipped at a profit sufficient to have paid your $9,000 from the claims which were sold to the defendants by you and Lockwood? A. Why, I think with an expenditure of $5,000 sinking this vertical shaft, that the mine could have been paying right along.''

Appellants, as appears from the evidence, did not work the mining claims after the payment of the $12,000, did not receive any net proceeds therefrom whatever, and did not pay plaintiffs any more money.

The court made findings of fact and conclusions of law in favor of the plaintiffs. The principal part of the findings merely relate to the contracts entered into by the parties. It, however, made some additional findings as follows:

''That said defendants, Geddes, Snyder and Beckett, at the time of the execution of said option agreement on the 2d day of July, 1901, and said agreement of October 4, 1901, represented and stated they would immediately work and develop said mining claims; that they had sufficient means with which to work said property; that the examination made and caused to be made by them of said property showed that said mining claims contained large deposits of ore from which, at an ex-

pense not to exceed  five thousand ($5,000.00) dollars, they could have mined and shipped lead, silver and other ores, at a profit, and discharged said indebtedness of $9,000.

"The court further finds that said mining property is valuable for mining purposes, and is of a valuation of at least $50,000; that it contains valuable deposits of ore which can be mined and shipped at a profit, and that if defendants had worked said property and mined the ore therein they could, within a short time after entering into said contract, have paid said $9,000 out of one-half of the net proceeds of the ores mined from said property, and by such proceeds (the court means, proceeds of the sales of ores taken from said property), remaining after the defendants deducted the moneys paid by them, or expenses incurred in mining, milling, sampling, handling, transporting, smelting or marketing such ores.

"The court further finds that the said defendants, after obtaining said option and entering into said agreements on October 4, 1901, refused to work said mining claims, or to extract and remove ore therefrom; that plaintiffs, upon a number of occasions between said dates and the commencement of this action, requested the defendants to work, operate and develop said property and to ship ores therefrom and to pay said $9,000, but the said defendants refused upon each occasion, and continued to refuse to work said property, or to mine the ores thereon or to pay said $9,000, or any part thereof. That from the year 1901, when the defendants obtained a deed to said premises, until the time of the trial, the said defendants have not worked said property or expended any sum of money thereon or attempted to develop said property or to ship ore therefrom, but during all of said period refused, and still refuse, to work, develop or operate said property, or to pay said $9,000; and the said defendants give out and declare that they are under no obligation whatever to either work said property or to ship ore therefrom, and further give out and declare that they never will be required to pay the said $9,000, or any part thereof, until they shall work said property, and from one-half of the net proceeds thereof derive a sufficient sum to pay and discharge said $9,000."

Upon the findings and conclusions of law the court entered
a judgment or decree in favor of plaintiffs for the sum
of $9,000, with 8 per cent. interest from September 1,        **1, 2**
1909, amounting to $5,100, declared said principal and
interest to be a lien upon the mining claims and ordered them
sold to pay the amount found due as aforesaid. The defend-
ants appeal to this court and here assail the findings of fact,
conclusions of law, and judgment.

The findings, and especially those we have hereinbefore set
forth, are assailed both upon the alleged ground that they are
not sustained by the evidence, and that they are immaterial
under the issues.

The district court seems to have proceeded upon the theory
outlined by plaintiffs' counsel, the substance of which may be
stated thus: That inasmuch as the $9,000 were mentioned in
the contracts as being a part of the $21,000 purchase price for
the mining claims, and although defendants agreed to pay
that sum out of the net proceeds which they should obtain
from the mining claims, yet that sum was payable at all
events within a reasonable time after the deed was executed
and delivered; that notwithstanding the defendants have had
a reasonable time within which to develop said mining claims
and obtain therefrom sufficient net proceeds to pay said sum
of money, they, nevertheless, have failed and neglected to do
so and for that reason said sum of $9,000 became due when
such a reasonable time had elapsed, which was on the 1st day
of September, 1909, or 23 days before this action was com-
menced. Plaintiffs' counsel, in this court, defend the judg-
ment of the court upon the theory just outlined. In support
of their contention counsel refer to the following Utah cases,
namely, *Charter Oak, etc., Co.* v. *Gisborne*, 5 Utah 319, 15
Pac. 253; *McIntyre* v. *Ajax M. Co.*, 20 Utah 323, 60 Pac. 552,
and 28 Utah 162, 77 Pac. 613; *Haslam* v. *Haslam*, 19 Utah 1,
56 Pac. 243, and *Schenck* v. *Wicks*, 23 Utah 576, 65 Pac. 732.
Cases are also cited from other jurisdictions. Inasmuch as we
are firmly convinced that both the plaintiffs and the defend-
ant must stand or fall by the terms of their contract we do
not deem it necessary to specially point out why the foregoing
cases are not controlling, much less do we deem it necessary

to review any of them. In this connection we also desire to state that while plaintiffs' counsel have filed an elaborate brief and argument, yet we shall not attempt to follow and answer their arguments except as that is done in the statements made in the course of this opinion.

At the threshold of this controversy we are again reminded that courts are created to enforce and not to make contracts. In other words, unless it is shown that the contract in question was obtained by fraud, oppression, or duress, or that it is against law or public policy, or is unconscionable, it is the duty of the courts to enforce it according to its terms and not by forced construction to modify or disregard it. The terms of the contract in question here, as we view them, are so explicit, so plain, and are expressed in such apt and clear language that there really is nothing for a court to construe. It is true that the district court made certain findings, among others, that when the option agreement was entered into in 1901 some of the defendants made certain statements to the effect that they would "immediately work and develop said mining claims," etc. That finding is assailed. It must not be overlooked that the finding relates to the time when the original option agreement was entered into, namely, in 1901. Now, by reference to that agreement it will be seen that the finding is in the very teeth of its terms. In that agreement it is provided:

"The extent and manner of managing and developing said property shall be left solely to the sound and reasonable discretion of said parties of the second part [defendants]."

Further it was provided that "when the property is being worked" the plaintiffs shall be given employment, etc. Plaintiffs' counsel, however (and it seems the district court took their view), insist that notwithstanding the fact 3, 4 that plaintiffs then agreed that the working and development of the mining claims, as well as "the extent and manner" thereof, should be left to the judgment or discretion of the defendants, yet such should be the case only if the work and development should comport with the wishes or judgment of the plaintiffs, or the judgment of some court to which the matter might be submitted. True, the court

finds that certain statements were made, but such statements, if made at all, were also found to have been contemporaneous with the making of the contract, and, under elementary rules of evidence, can, therefore, not be given the effect of enlarging the liability under the contract. But the statements can be given no force or effect for the simple reason that they are directly contrary to and hence contradictory of the terms of the contract, and for the further reason that it is neither claimed nor found that they were intended for or constituted a modification of the contract. Neither can the other findings of the court, except those relating to the contract, be given any effect for the obvious reason that the rights of the parties must be determined from the terms of the contract alone. It is quite true that where the terms of a contract are uncertain or obscure the court not only may, but it ought to, avail itself of all legitimate legal evidence which will shed light upon the intention of the parties and upon the rights granted upon the one side and the obligations assumed upon the other. A court may, however, not receive evidence for the sole purpose of enlarging the rights upon the one side and increasing the obligations upon the other. Nor may a court do that simply because the provisions of the contract in its judgment should have been made more equitable.

Let us pause for a moment to see what the contract says concerning the rights of the plaintiffs and the duties or obligations assumed by the defendants. In the first option agreement it is made as plain as the English language **5, 6** can make it that the $9,000 "shall be paid only" out of the "net one-half of the proceeds of all ores mined from said property." Then follows the provision that the defendants shall determine the "extent and manner" of the development work. In another part of the option agreement it was again provided that the $9,000 shall be paid "in the manner, and only in the manner, provided for by paragraph 5," which paragraph we have quoted in full. Then again in the final contract, which was made and delivered pursuant to the option contract and after or contemporaneous with the deed to the mining claims, after again providing that the $9,000 shall be payable only out of one-half of the net proceeds, it is said:

"It is distinctly understood and agreed that the first par-
ties [the defendants] shall not be liable hereunder to pay to
the second parties any sum whatever unless said net proceeds
are realized by them out of said property, and then only to
the extent .of one-half of such net proceeds until the full
sum of $9,000 shall be paid to the second parties [the plain-
tiffs]."

In order to secure the $9,000, regardless of the time when
the ore shall be mined and the net proceeds, if any, obtained,
the parties in that contract also provided:

"This contract shall be deemed and construed as a cove-
nant running with the title to said land and shall bind the
grantors, heirs and assigns of the first parties."

Considering, therefore, all of the provisions of the contract
together it is quite clear that it was assumed by all the parties
that it might not only be a long time before one-half of the
net proceeds would be obtained in sufficient quantities to pay
the $9,000, but that it was possible that one-half of the pro-
ceeds might not reach that sum at any time. This is made
clearer still when reference is had to the purchase price that
was fixed in the two options. In one the defendants could
obtain the mining claims by paying $16,000 in full therefor.
They declined to pay that amount, but elected to purchase
under the other option by the terms of which they were re-
quired to pay only $12,000 of their own money, but were
required to pay an additional $9,000 (which was $5,000 more
than the first option), but they were required and agreed to
pay said $9,000 only out of one-half of the net proceeds to be
derived from the mining claims. Notwithstanding the fact,
however, that the plaintiffs were willing to sell the mining
claims for $16,000 in full, one of the plaintiffs testified that
the claims were worth $50,000 at the time they were sold, and
were worth that at the time of the trial. Plaintiffs, however,
gave the defendants the option to purchase the mining claims
for $12,000 in money regardless of whether that amount, or
any amount, was realized out of the property, and for an addi-
tional $9,000 making the purchase price $21,000, but agreed
that the $9,000 should be paid only out of one-half of the net
proceeds, if any, obtained from the mining claims. The de-

fendants agreed to the latter proposition, paid the plaintiffs $12,000 as agreed, but paid no more and have never worked nor developed the mining claims nor have realized any net proceeds therefrom. The defendants did not, certainly not in express terms, agree to work and develop the mining claims. No doubt it was their intention to do that, and no doubt it was assumed by the plaintiffs that they would do so. There is, however, nothing in the contract, that obligates the defendants to do so at any time nor within what any one else might consider to be a reasonable time. If the plaintiffs had desired such a contract they should have demanded it when the option was given to the defendants, and the latter could then either have accepted or declined the proposed conditions. It is too late to impose conditions after a new contract has been entered into which supersedes the old one.

But there is still another reason why the district court's construction of the contract in question cannot prevail. Under the contract no payments were due nor could become due until the defendants had obtained at least some net proceeds. If they had worked the mining claims during all of the years from 1901 to the present time, and had obtained no net proceeds, nothing would be due under the terms of the contract, and if, during that time, they had obtained net proceeds in any amount less than $18,000, the plaintiffs would have been entitled to only one-half of the amount realized, whether that amount was $1,000 or $10,000, or any other sum less than $18,000. If, therefore, the defendants had obtained net proceeds from the mining claims and had failed or neglected or refused to pay plaintiffs one-half thereof, the plaintiffs could have sued for and recovered said one-half and no more, and the burden of proof in such an action would have been upon them to establish that the defendants had realized net proceeds, and the amount thereof. The district court, however, held that in view that the plaintiffs did not, within a reasonable time, work and develop the mining claims, and therefore did not to an absolute certainty demonstrate the fact that they could not obtain net proceeds from the claims, for that reason they should be required to pay the whole $9,000 with legal interest from September 1, 1901, the date when,

according to the judgment of the district court, a reasonable time had elapsed. This is not a case where one party to a contract may sue and recover before his claim has matured under the terms of the contract upon the ground that the other party to the contract has, by his own act, deprived himself of the ability to perform according to the terms of the contract when it has matured. Here the parties made ample provision in the contract that such a condition could not arise. The defendants can never prevent the plaintiffs from having recourse to the mining claims in case there are net proceeds derived therefrom. Neither can they, under the terms of the contract, have recourse against the defendants personally, nor against the mining claims, unless and until either the defendants, or some one who claims under them, obtain some net proceeds from the mining claims. This is their contract, and they must abide by it.

It is, however, suggested that if this conclusion is sound, then the defendants may never pay the $9,000, and can never be compelled to do so, although they hold and enjoy the mining claims. There are several answers to that contention. The first one is that under the terms of the agreement the defendants did not obligate themselves to pay unless and until they realized net proceeds from the mining claims. Secondly, that they did not agree to pay the $9,000 out of the net proceeds within a reasonable time, or at any time, unless they should first realize the net proceeds. Nor did they obligate themselves to work the mining claims within a reasonable time, nor within a specified time, or at all. That was a matter taken for granted by the plaintiffs, but not agreed to by the defendants, and hence is not a part of the obligations assumed by them. The third answer is, that if the defendants have in any way breached the terms or conditions of their contract the plaintiffs may sue and recover such damages as they may have sustained thereby, precisely the same as they would have to do in case of a breach of any other contract. Courts of law are always open for such actions, and courts of equity may act only when the remedy at law is inadequate. Again, courts of equity may not, under the guise of construction, so change or modify contracts as

to impose conditions or obligations not expressed or clearly implied, although such conditions or modifications, in the judgment of the court, may make the terms and conditions of the contract more equitable and more in accord with the court's sense of justice. Where the terms and conditions of a contract are not unconscionable, and no fraud, duress, or misrepresentation is claimed, the courts must enforce all contracts as the parties have made them and not as the court thinks they should have been made. Neither can a court of equity give relief merely because under a long-time contract the parties did not foresee and provide for all possible emergencies that might arise. Under the contract in question the defendants no doubt paid the $12,000 for the mining claims in the hope and expectation that they could make a profit out of them, and the plaintiffs were willing to sell the claims for $16,000 in money in full payment or for $12,000 in money with the promise that they should receive $9,000 additional out of one-half of the net proceeds that should be obtained from the claims. The defendants were not willing to risk $16,000 but were willing to take the chance of getting back their $12,000, while the plaintiffs were willing to take the $12,000, and also take the risk of getting $9,000 in addition out of the net proceeds that should be derived from the mining claims in case any net proceeds should be obtained therefrom. The plaintiffs took it for granted, however, that the necessary net proceeds would be realized. We can see nothing unfair nor unjust in such a contract, although it afterwards develops that for eight years or more the defendants made no effort to work or develop the property for which they had paid $12,000 in cash.

But even though it were conceded that the district court's theory were correct, yet the fact that the defendants could have realized net proceeds in any amount between July, 1901, and September, 1909, in our judgment, is not established. When one of the plaintiffs was testifying he was questioned with regard to whether, in his judgment, the mining claims could have been worked so that they would have yielded "profits sufficient to have paid your $9,000." He answered thus:

"Why, I think with an expenditure of $5,000 sinking this vertical shaft that the mine could have been paying right along."

While, according to the view we have taken, that evidence is wholly beside the question which controls here, yet where is there anything on or between the lines of the contract sued on which required the defendants to expend $5,000, or any other sum, to sink a shaft? That matter was expressly left to their own judgment. Moreover, as already pointed out, a complete answer to the contention that the $9,000 are due and payable is the condition of the contract that if the defendants had worked the mining claims for any number of years and up to the present time, or would continue to work them for any length of time in the future, and they had obtained no net proceeds, or should obtain none, plaintiffs would have no right of action; and in case they had obtained net proceeds in the past, or should obtain some in the future, plaintiffs' right of recovery would be limited to one-half thereof until they had obtained $9,000. Now, plaintiffs concede that no net proceeds have been obtained, and further testify that in order to make the mine pay, that is, to obtain any net proceeds therefrom, defendants would have to expend an additional $5,000, and in the very teeth of those facts contend, and the court found, that the $9,000 were due with $5,100 accrued interest. We confess our entire inability to see how this can be due under the contract without disregarding its terms upon the one hand and without imposing duties upon the defendants not assumed by them upon the other. Much evidence was admitted and considered by the court regarding the condition of the mining claims and, their probable value. In our judgment that evidence is without any force whatever. The parties have expressly agreed upon the price to be paid which, for the purposes of this case, must be assumed was deemed the reasonable value. Moreover, the parties have fixed the time and manner of paying the purchase price, and we cannot understand how the condition of the mining claims or their speculative value can be given any effect in construing the language employed in the contract

sued on. We have thus refrained from referring to the evidence just mentioned.

The real question in this case may thus be viewed from any angle, and still we arrive at the same conclusion, namely, that under the contract the defendants did not obligate themselves to do the things the district court has required of them, and hence the judgment of that court cannot be sustained.

In conclusion we desire to add that counsel for the defendants have referred to the case of *Consolidated Arizona Smelting Co.* v. *Hinchman,* 212 Fed. 813, 129 C. C. A. 267. A perusal of that case has convinced us that it is very much in point in favor of the contentions of the defendants, and is in harmony with the conclusions that we have reached. It is not necessary, however, to do more than refer to the case.

The judgment, for the reasons stated, is reversed and the cause is remanded to the district court of Salt Lake county, with directions to set aside its findings of fact and conclusions of law in so far as they are in conflict with this opinion, and to substitute others which are in accordance with the views herein expressed, and to enter judgment dismissing the complaint. Appellant to recover costs.

McCARTY, J.

I concur. It is a recognized rule of law that where a contract is susceptible of two constructions, each of which is probable, or its meaning otherwise rendered doubtful, the court, in order to construe the contract so as to give it the meaning and effect the parties who made it intended that it should have, will place itself, as nearly as can be done, in the position of the parties "by admitting evidence of the surrounding facts and circumstances, the nature of the subject-matter, the relation of the parties to the contract, and the objects sought to be accomplished by the contract." 2 Page on Contracts, section 1123. It is also a well-recognized rule of construction that a contract should be considered and construed as an entirety and should be interpreted so as to give effect, if possible, to each provision therein contained. By following and applying these familiar rules of construction

in construing the contract under consideration, the uncertainty, if any, of its provisions is more apparent than real, and its meaning—the intention of the parties making it—is reasonably plain and free from doubt.

The record shows that some time about the first of the year 1900, the exact date is not given nor is it material, plaintiffs entered into a contract with one W. R. Sloan whereby they were given an option for two years to purchase a portion of the mining claims involved in this litigation. The group then consisted of one patented and two unpatented claims. The court found, and the evidence shows, that Sloan "agreed to sell and convey said claims to plaintiffs for the sum of $5,000, and plaintiffs thereon paid the sum of $500 to him, and the said Sloan placed a deed in escrow with the Wells-Fargo Company, Bankers, Salt Lake City, Utah, to be delivered to the plaintiffs upon payment by them of the further sum of $4,500.

Plaintiffs, immediately after the execution of their contract with Sloan, took possession of the property, commenced, and, continuously for fifteen months thereafter, prosecuted development work thereon. It is admitted, and the record shows, that prior to the time plaintiffs took possession of the property a large amount of work had been done thereon. Respondents (plaintiffs below) in their printed brief say:

"These claims had been worked prior to 1901 for many years, and more than $30,000 worth of work had been done on the same."

There was an incline 800, and one 300, feet in depth and several perpendicular shafts ranging in depth from 50 to 200 feet, besides numerous drifts and tunnels on the property. Plaintiffs, immediately after taking possession, located four claims contiguous to the property. A United States patent was later on procured for the six unpatented claims by and at the defendants' expense. During the fifteen months plaintiffs were at work on the property they expended, in addition to their time and labor, $3,500 in cash in their efforts to make the enterprise a going and paying concern.

Silas F. Johnson, one of the plaintiffs, who is a practical mining man of long experience, testified in part as follows:

"Lockwood and I put in about fifteen months' work; we had some hired men; we spent about $3,500 there besides our own time. That was cash. * * * We didn't spend much on the four claims we located. As a matter of fact, the four claims didn't cost us anything except the expense of making the locations. * * * Mr. Lockwood and I worked there for fifteen months practically every day. * * * We didn't keep on because it was impossible to get the ore out of this long incline. We spent at least six months trying to straighten it up and clean the waste out of it in order to get the ore, and we couldn't make a success of it after we did it. * * * I gave an option on the property for $16,000 for the simple reason I hadn't the money to develop it."

The only conclusion deducible from these facts, as I read the record, is that this group of mining claims could not, without the expenditure of a large sum of money, be placed on a paying basis; and even with an outlay of large sums of money there was nothing in the then condition and appearance of the property to justify more than a vague hope or belief on the part of the plaintiffs that merchantable ore would be found in sufficient quantities to more than pay the running expenses of working the mine. That such was the opinion of the plaintiff Johnson, who testified as a witness in the case, I think, is too plain to admit of serious argument. His testimony, considered in connection with the somewhat unusual favorable terms in the contract providing how the final payment of $9,000 may be made, I think, shows this.

Reference is made to a copy of a written report introduced in evidence by plaintiffs that was made by a civil engineer and mining expert of the result of an examination he made of the property and samples of ore taken therefrom and assayed, just prior to or about the time the contract in question was executed. The report, among other somewhat extravagant, and, in view of the evidence of Silas F. Johnson, one of the plaintiffs, who was familiar with every incline, shaft, drift, and tunnel in the mine, and the amount and character of the ore exposed, I might add, reckless and misleading statements therein set forth contains the following respecting the tonnage and value of "high-grade" ores exposed in the mine, namely:

''In the two inclines mentioned, limiting the measurement severely on an estimate, the tonnage practically in sight can safely be considered as 300 tons of an average value of $30 per ton.  In extracting this it will be necessary to take out an equal amount of waste.  The expense of mining this in a small way will be high, about $2 per ton:

| | |
|---|---|
| Mining | $ 2.00 |
| Hauling to Milford | 1.25 |
| Freight | 3.50 |
| Sampling and smelting | 6.00 |
| | $12.75 |

—leaving a net profit of $17.25 per ton, or $8,625.  There is every probability that when this ore is extracted an equal tonnage will be exposed, and that this will continue indefinitely.  *  *  *

''The showing at the bottom of the 800-foot incline shaft is extremely favorable for a very large tonnage.  The recent development does not show the width of the ore body except to the extent that it is greater than 20 feet.  The surface of the vein matter directly above this point is 100 feet or more across, and a comparatively small amount of work below would probably open tonnage to furnish a 200-ton mill indefinitely.  The profit that could be realized on the operation of the 200-ton concentrator on ore of the grade now exposed would be:  *  *  * Net profit per month, $28,320.00.''

This report, in so far as it deals with the amount and value of the ores exposed in the mine, is manifestly unreliable and misleading.  It is a matter of common knowledge to all parties, and their numbers are legion, who have had experience in and are familiar in a general way with the mining industry in this and adjoining states, that a mine containing the amount and character of ore described in the report as being exposed and partially blocked out could readily have been sold for many times the price named in the contract.  While the defendants may have been, and probably were, misled by the report respecting the amount and the character of the ore exposed and the value of the mine, it is manifest that plaintiffs were not, in any respect, misled by it.  Their willingness

to dispose of the property for $16,000, payable in install-
ments, at intervals covering a period of one year, as provided
in a contract executed by the parties contemporaneously with
the contract under consideration, or for $21,000 as provided in
the contract here involved, namely, $12,000 in cash and $9,000
payable from the ''net proceeds'' of ores mined and ''not
otherwise,'' is very persuasive, if it does not conclusively
show that in their opinion values placed on the mine in excess
of $16,000 were largely, if not entirely, speculative and con-
jectural. Moreover, it is inconceivable that Sloan would have
parted with mining property containing the extensive bodies
of commercial ore mentioned in the report and there described
as being exposed and partially blocked out for $5,000, giving
the parties purchasing it two years in which to pay $4,500 of
the purchase price and that plaintiffs would have expended
thereon $3,500, besides fifteen months of their time and labor,
without being able to take out sufficient of this high-grade
shipping ore to pay the running expenses of operating the
mine. As considerable importance seems to be attached to the
report and as it is practically the only matter in the record
that in any sense tends to support the finding of the trial
court, that the property ''contains valuable deposite of ore
which can be mined and shipped at a profit, and that if de-
fendants had worked said property and mined the ore therein
they could, within a short time after entering into said con-
tract, have paid said $9,000 out of one-half of the net pro-
ceeds of the ores mined from said property,'' I shall, for the
purpose of further showing the unreliable and misleading
character of the instrument, refer, in a general way, to the
evidence of the witness Johnson, one of the plaintiffs, wherein
he described in detail the condition of the mine and the amount
of development work done thereon since the execution of the
contract. He stated that three different parties were given
options by defendants to purchase the property, each of whom
operated—worked on—the property for a few months and
then abandoned it; that the development work done on the
property since the execution of the contract aggregated from
$6,000 to $7,000, and that but little, if any, ore had been
mined and shipped therefrom. He also testified that in his

opinion it would require a further expenditure of $5,000 in development work to put the mine on a paying basis. Therefore the finding of fact referred to, made by the court, is not only unsupported by but is contrary to the overwhelming weight of the evidence.

Furthermore, the report was the rankest kind of hearsay evidence, and if proper and timely objections had been made when it was offered in evidence the trial court would undoubtedly have excluded it. While the admission of it in evidence without objection entitles plaintiffs to have it considered by this court, its unreliable character as hearsay may, nevertheless, be considered in determining the weight that should be given it. The evidence of the witness Johnson as to the condition of the mine respecting the amount and character of the ore therein exposed, the amount of development work done and expenditures made by plaintiffs and their inability to mine sufficient ore to pay the running expenses, the $6,000 or $7,000 worth of development work done since the contract was executed, and the limited amount of ore, if any, the parties doing the work were able to mine, considered in connection with his evidence wherein he says that in his opinion it will require an expenditure of $5,000 to put the property in a condition so that "ore can be mined and shipped at a profit," completely destroys, as I view the record, the value of the report as evidence.

I here remark, parenthetically, it is safe to predict that if the numerous—countless—undeveloped mining claims in this and the adjoining states that have heretofore been examined, and reports, both verbal and written, made thereon, by mining experts and men claiming to be such, had, in the majority of cases, possessed the merit claimed for them in the reports, including the property in question, and the properties had been continuously worked to their full capacity, the output of silver bullion would be equal to if not greater than that of copper, and the output of gold so great as to demonetize it and to make the metal a drug on the market.

The plaintiffs, as stated, were given an option for two years by Sloan in which to purchase the property. They paid $500 on the purchase price and expended $3,500 in cash, be-

sides fifteen months of their time and labor, in trying to make the mine a dividend paying concern. In other words, plaintiffs, at the time the contract was executed, had invested $4,000 in cash and fifteen months of their time and labor, making a total investment by them of about $7,000. This, they realized, would be irretrievably lost to them unless they could induce men with means to take the property off their hands before their option, which had about six months to run, expired. They were given an opportunity by defendants, which they took advantage of, to dispose of the property on terms that would return to them the $4,000 cash they had put into the enterprise, pay Sloan the balance owing him on the purchase price ($4,500), give them $3,500 for the fifteen months' labor that each of them put in the mine, which would be equal to $116.66 per month for each of them over and above their expenses, besides guaranteeing to them one-half of the net proceeds of all ores thereafter mined and shipped until they shall have received $9,000 out of such net proceeds. It was under these circumstances, as shown by the record, that the contract under consideration was made and executed.

The defendants paid $12,000 of the purchase price as provided in the contract. The provision of the contract providing how and under what circumstances the balance ($9,000) may be paid is as follows:

"The balance of the above-named purchase price ($21,000) being the sum of $9,000, shall be paid only in the manner following and not otherwise, that is to say, on and after the 2d day of July, 1902, the said second parties or their assigns shall pay over to said first parties or their assigns a net one-half of said second parties' net proceeds from said mine, meaning thereby a net one-half of the proceeds of all ores mined from said property after the said second parties have deducted all moneys paid by them or expense incurred," etc.

The contract further provides that:

"The *extent and manner* of managing and developing said property *shall be left solely* to the sound and reasonable discretion of said second parties." (Italics mine.)

These provisions, whether read by themselves or in connection with the other provisions of the contract, are plain and

free from ambiguity. They provide, first, that the $9,000 shall be paid from the *net proceeds* of the mine "*and not otherwise,*" and, second, that the *extent and manner* of managing and developing the mine shall be left solely to the sound and reasonable discretion of the defendants.

That the parties anticipated at the time the contract was executed, and at the time the deed conveying the title of the property to defendants was delivered, that the plaintiffs might have to wait indefinitely for the payment of the $9,000, or any portion thereof, and that defendants would not be called on to pay any part of the amount until there are "net proceeds" from ores mined with which to make payment, I think, is further evidenced by certain provisions of a contract, herein referred to, executed by the parties contemporaneously with the delivery of the deed. That contract or agreement is incorporated in the opinion written by Mr. Justice FRICK. It provides that the defendants will pay to plaintiffs one-half of the "net proceeds of all ores mined * * * from said property" until plaintiffs shall have received "the sum total of $9,000 out of such proceeds." It is also provided that the "contract shall be deemed and construed as a covenant running with the title to said land and shall bind the grantees, and heirs and assigns," etc. It also contains the following provision:

"It is distinctly understood and agreed that the first parties shall not be liable hereunder to pay to the second parties any sum whatever unless such net proceeds are realized by them out of said property, and then only to the extent of one-half of such net proceeds until the full sum of $9,000 shall be paid to the second parties."

No claim is made by plaintiffs that any net proceeds of ores taken from the mine have been received. In fact the record shows that at no time since plaintiffs first became interested in the property have the proceeds of the ore been sufficient to pay the running expenses of the mine, or any considerable portion thereof. The provisions of the contract herein set forth, considered in connection with the circumstances and conditions with which plaintiffs were confronted in a financial way, their knowledge of the mine and of the

extent and value of the ore exposed therein at the time the contract was executed, I think clearly show that the parties, especially the plaintiffs, were doubtful as to whether the mine ever would or could be worked at a profit, and that it was uncertain as to whether there ever would be any net proceeds from ore mined, and that they executed the contract with that uncertainty in view and with the understanding that the payment of the $9,000 would be made from the "net proceeds of ores mined and not otherwise." In other words, I think it is plain that the payment of the $9,000 was contingent upon the mine being operated and worked at a profit.

In order to uphold the judgment of the trial court it seems to me that this court must refuse to give effect to the porvisions of the contract herein referred to, namely, the provision providing that the $9,000 shall be paid out of the net proceeds of ores mined *and not otherwise,* the provision providing that "the *extent* and manner of developing the property shall be left *solely*" with the defendants, and that defendants "shall not be liable to pay (plaintiffs) any sum whatever unless such net proceeds are realized by them out of said property." This, I submit, a court has no right to do.

Furthermore, it is almost unbelievable that defendants would have bound themselves to pay $9,000 in addition to the $12,000 received by plaintiffs on the purchase price, regardless of whether the mine should be operated at a profit or loss, when they had an option to take over the property for $16,000, payable in installments covering a period of one year. We therefore must, in order to affirm the judgment, not only refuse, as stated, to give effect to the provisions in the contract to which I have just referred, but we must in effect hold that the defendants, whom we have a right to believe from the record were men of average intelligence, possessing ordinary business acumen and shrewdness, were willing to and did bind themselves to pay $21,000 for property on which they had an option to purchase for $16,000.

Counsel for plaintiffs, in their printed brief, say that the contract "clearly contemplates that defendants should work and develop the property" and devote considerable space in discussing the alleged dereliction of defendants in that regard.

The action is not brought to recover damages for an alleged breach of the contract by defendants in failing to work the property. The action is to enforce an alleged vendor's lien and to subject the property to the payment of the lien. If the plaintiffs are entitled to have the $9,000 declared a lien on the property and the lien foreclosed and the property sold and the amount of the lien paid out of the proceeds of the sale, then I submit that the right would have existed even though the parties who have been in possession of the property since the execution of the contract had expended $7,000, or, for that matter, $70,000, each year on the property without realizing any profit or "net proceeds." If the $9,000 mentioned in the contract is a lien on the property, as declared by the trial court, the continuity with which work may have been prosecuted and the amount of money expended in carrying on the work without paying the expenses of operating the mine could not in any sense affect the plaintiffs' right to foreclose the lien and subject the property to the payment of the obligation. In other words, if defendants, at great expense, had kept a large force of men continuously at work, since the contract was executed, and had been unable to extract and market sufficient ore to pay expenses, they would be in no better position to resist the foreclosure of the lien than they are under the existing state of the record.

STRAUP, C. J.

I dissent. True, the court cannot make a new contract for parties. It, however, is required to construe and give effect to those made by them. The intention of the parties as expressed in language employed by them of course must govern. The several contracts being parts of one transaction should be read together and construed with reference to each other and to the subject to which they relate and with which they deal.

The defendants purchased from the plaintiffs seven mining claims lying in the vicinity of other claims from which pay ore was being shipped, some of great value. When purchased, the claims were not wholly undeveloped. About 3,000 feet of work, running tunnels and inclines and sinking shafts, had been done upon them, and pay ore taken out of them.

Testimony was given on behalf of plaintiffs to show the character and extent of the workings and the grade and quantity of ore exposed. One of the plaintiffs, after testifying concerning such subjects, testified that the mining properties were of the value of $50,000. And, as shown by the report of a mining engineer, who at the request of the defendants experted the properties and submitted his report to them before they purchased, there were, among other workings, an incline shaft of 800 feet following down shipping ore in a secondary vein and at the bottom, about 208 feet below the surface, "passed close to and probably partially entered the large primary vein." At the bottom of another incline shaft down 300 feet and running on a secondary vein the ore pitched toward the main vein "and no doubt leads into it." He described other workings showing ore, and about a half dozen shafts about fifty feet deep showing streaks of high grade ore assaying from samples taken therefrom values, in lead, silver, copper, and gold, a number of them, from $26 to $65, one as high as $258, and a number from $8 to $18. He reported that at two inclines mentioned and described in his report 300 tons of ore were exposed at an average value of $30 a ton which could be extracted, hauled, sampled, and smelted at a net profit of $8,625, and that the showing at the bottom of the 800-foot incline shaft "is extremely valuable for a very large tonnage," and that "a comparatively small amount of work below would probably open tonnage to furnish a 200-ton mill indefinitely," and that "the profit that could be realized by the operation of a 200-ton concentrator on ore of the grade now exposed would be * * * a net profit per month of $28,320."

His "resume" is:

"Although this property has not had the advantage of any intelligent development and the workings in many cases resemble gopher holes, there is, nevertheless, sufficient evidence to convince me that there is here an exceptional opportunity for developing a mine of great value."

Against this the defendants gave no testimony and adduced nothing to show that the mine did not contain pay ore, or that it could not have been worked profitably, or that any

effort was made by them to work the property, or to extract ore therefrom. The findings of the court that the properties are valuable for mining purposes, and that they ''contain valuable deposits of ore which can be mined and shipped at a profit, and that if defendants had worked said property and mined the ore therein they could, within a short. time after entering into said contract, have paid said $9,000 out of one-half of the net proceeds of the ores mined from said property,'' but had wilfully and without cause refused to work it and meet such payment, are not only well, but substantially without conflict, supported by the evidence.

In July, 1901, the defendants unconditionally purchased the claims from the plaintiffs, but with the option to pay $16,000 in cash, payable in installments, or $21,000, $12,000 of which in cash, payable in installments, and $9,000 out of net proceeds of ore mined by the defendants, or their assigns, from the properties. The defendants chose the latter. There thus was an absolute sale and an unconditional promise to pay the sum of $21,000, $12,000 of which to be paid in cash in installments, and $9,000 out of net proceeds of ore mined by them from the properties. By their contract of July, 1901, it was provided that ''the balance of the above-named purchase price [$21,000] being the sum of $9,000, shall be paid'' in manner that ''on and after the 2d day of July, 1902 (when the last installment of the $12,000 was due), said second parties (defendants), or their assigns, shall pay over to the said first parties, or their assigns, the net one-half of said second parties' proceeds from said mine, meaning thereby a net one-half of the proceeds of all ores mined from said property after the said second parties have deducted all moneys paid out by them for expenses incurred in mining, milling, sampling, handling, transporting, smelting, and marketing said ores.'' In October, 1901, the defendants paid the full amount of the $12,000 at which time plaintiffs made their deed conveying unqualified title to the properties to the defendants. Contemporaneous therewith, and in consideration thereof, by further agreement, and in accordance with the prior or main agreement, it was provided:

''That the first parties (defendants) hereby promise and

agree for themselves, and their assigns, that they will pay to the second parties, or their assigns, one-half of the net proceeds of all ores mined by the first parties, or their assigns, from said property until the second parties shall have received the sum total of $9,000 out of said net proceeds.''

The defendants thus just as unconditionally agreed to pay $9,000 out of net proceeds of ore mined by them from the properties as to pay the $12,000 in cash. The language of their contract admits of no other interpretation. But the defendants say that they had not agreed to work the properties or to mine or take out any ore. But they in no uncertain terms agreed to pay $9,000 out of proceeds of ore mined by them from the properties. They, of course, could not comply with such stipulation unless the properties were mined by them and ore extracted therefrom, for ore does not thrust itself out of the ground, nor without human agency reduce itself to a marketable product. As well say that a vendee, who, as part of the purchase price of a farm, had agreed to pay a sum definite out of net proceeds of crops raised by him on the farm, was not required to farm it or to raise any crops, for it was not nominated in the bond that he was to till, sow, or reap. To say one had agreed to pay $9,000 out of proceeds of ore mined by him from the property, and then say he was at no time required to work or mine it or do anything to obtain ore, seems to me but contradictory propositions. I thus think the defendants had a duty to perform and were required to make reasonable efforts to meet the payment out of net proceeds of ore, and that they were entitled to a reasonable time to do that.

The period of eight years they had to do so certainly was more than reasonable time. The stipulations in the first or main contract that ''the extent or manner of managing and developing said property shall be left solely to the sound and reasonable discretion of said parties of the second part,'' and that the plaintiffs should be given employment under orders and directions of the defendants ''when the property is being worked,'' do not imply that the defendants, in compliance with their contract to pay $9,000 out of net proceeds of ore mined by them, were not required to work the property, but

rather imply an intention that the property was to be worked, but under the exclusive management and control of the defendants. Notwithstanding the conveyance to them of an unqualified title, their exclusive possession of the properties, and, as found by the court and shown by the evidence, of valuable deposits of ore which could have been profitably extracted, and out of one-half of the net proceeds thereof the obligation of $9,000, shortly after entering into the contracts and the conveyance, could have been discharged, the defendants, nevertheless, for a period of about eight years, did nothing, made no effort, and wilfully refused to do anything, and when, on numerous demands that they proceed and work the property they but replied that they were not required to work it, that they were interested in other properties and would work those purchased from plaintiffs when they got ready, and that it was none of their business whether they worked them or not. And thus, for eight years before this action was commenced, and for seven more before judgment was rendered in the court below, have the plaintiffs been deprived of the unpaid purchase price of their claims conveyed to and exclusively possessed by the defendants.

Contracts, with such stipulations respecting payment as here, are and should be liberally construed in favor of the payee. *Smithers* v. *Junker*, (C. C.) 41 Fed. 101, 7 L. R. A. 264. So construing those in hand I think it clear that the defendants had a duty to perform respecting the discharge of their obligation as to payment of the unpaid $9,000 purchase price. I do not think it was contemplated by the parties that the $9,000 could become due only at the pleasure or will of the defendants regardless of lapse of time or the rights of the plaintiffs. To uphold the defendants in their contention but means that they have the sole right to say when such unpaid balance shall be paid, or that it shall never be paid. Surely that was not contemplated by the parties. I think the provision in the contract to pay the unpaid balance of the purchase price out of proceeds of ore mined by the defendants from the property constitutes but the means and not the end. And though the means had been inadequate to accomplish the end they, nevertheless, are not to control the

end, but must yield to it. 2 Story, Eq. Jur. (11th Ed.), Section 1064A; *Sears* v. *Wright,* 24 Me. 278. For much stronger reasons must this be true when the means are adequate and when the defendants wilfully refuse to resort to or to avail themselves of them. The plaintiffs conveyed and warranted an unqualified title to the defendants, not only in consideration of the payment of the $12,000, but also in consideration that the defendants, out of net proceeds of ore mined by them, pay the further sum of $9,000. Though the parties thought, as no doubt they did, that such net proceeds would, in a reasonable time, discharge the debt, yet, if such proceeds fail to accomplish the object of the conveyance and to discharge the debt, the provision that the $9,000 was to be paid out of net proceeds, does not prevent the application of the property itself thereto. *Gisborn* v. *Charter Oak Ins. Co.,* 142 U. S. 326, 12 Sup. Ct. 277, 35 L. Ed. 1029. Again, for stronger reasons, must that be true if the proceeds fail through the fault and refusal of the defendants to resort to the stipulated and available means to obtain them.

I do not see wherein the case of *Consolidated Arizona Smelting Company* v. *Hinchman,* 212 Fed. 813, 129 C. C. A. 237, cited and relied on by the defendants, supports them in their contention. The only thing there decided was that the provision of the contract there considered respecting payments of net proceeds from the operation of mining properties was not a part of the purchase price and not a covenant running with the land, but was merely personal, and did not create an equitable charge on the land. That is apparent from the syllabi, and is expressly so stated by the court in its opinion. Here the $9,000 to be paid out of the net proceeds admittedly is a part of the purchase price. The contracts in unmistakable terms so recite; in the one "the balance of the above-named purchase price ($21,000) being the sum of $9,000 shall be paid" out of net proceeds; in the other, "in consideration of the conveyance by" the plaintiffs of the claims, the defendants "promise and agree for themselves and their assigns that they will pay" the plaintiff net proceeds until the sum of $9,000 is paid; and by express provisions of the contract confessedly are covenants running with the land

charging it with the upaid purchase price of $9,000 in accordance with the terms of the contract.

Thus, from these considerations, do I think the judgment right declaring the unpaid purchase price of $9,000 due and unpaid, adjudging it a lien on the property and ordering it sold in satisfaction thereof. Something is said concerning interest. The court allowed no interest for the period of about eight years before the action was commenced and which time the defendants had to comply with their contract. It allowed interest only from the filing of the complaint to judgment, a period of a little more than seven years. If the plaintiffs were entitled to interest, as I think they were, they certainly were entitled to it for the period allowed.