## HOOD v. HAMPTON PLAINS EXPLORATION CO., Limited.

### (Circuit Court, D. Nevada. January 26, 1901.)

### No. 695.

1. CONTRACT OF EMPLOYMENT—CONDITION PRECEDENT TO PAYMENT OF WAGES—
   REASONABLE TIME.

   Defendant, a mining corporation, suspended work in its mines, and employed plaintiff as care-taker for its property at the agreed wages of four dollars per day, one-half to be paid at the end of each month, and one-half when the company should resume work or dispose of its property. *Held* that, there being no time specified when operations should be resumed or the property sold, it was an implied condition of the contract that it should be within a reasonable time, and that, after plaintiff had continued in the employment for four years, he was entitled to recover the wages retained, although defendant had not resumed work nor disposed of its property.

2. SAME—BREACH OF CONTRACT.

   Where plaintiff was employed as care-taker for the property of a mining company, a portion of his wages to be retained by the company until it should resume work or sell its property, his action in retaining and applying on such part of his wages a portion of the money collected by him for rents and for certain personal property sold by him, after four years had elapsed and the company had not resumed work nor sold its property, the collections being duly accounted for and reported by him, was not such a breach of trust as justified the company in discharging him and refusing to pay him the wages withheld.

3. SAME—WRONGFUL DISCHARGE.

   Where a portion of an employé's wages were to be retained by the employer until the occurrence of a certain event, until which time it was contemplated that his employment should continue, his wrongful discharge before that time renders the wages so withheld at once due and payable.

### At Law.

This action was brought by plaintiff to recover from defendant the sum of $2,889.82, alleged to be due him for 1,612 days' services, at $4 per day, as care-taker of defendant's mining property at Pittsburg, Nev., between September 30, 1895, and March 2, 1900. The action was originally brought in the state court, and thereafter, upon motion of defendant, removed to this court. The answer of the defendant denies that plaintiff rendered any services beyond 1,491 days. "Denies that for said or any services it promised to pay plaintiff a salary at the rate of $4 per day, or any rate, except as hereinafter specifically alleged. Denies that no part of said salary has been paid except the sum of $3,586.11. On the contrary, defendant alleges that it has paid to said plaintiff any and all sums of money due him on account of his said alleged services. Denies that there is still due or owing to plaintiff from this defendant for said services, or any services, the sum of $2,889.82, or any sum of money." For further answer, and by way of affirmative defense, defendant alleges that: "On or about the 30th day of September, 1895, defendant employed this plaintiff as care-taker of its property, real and personal. * * * That plaintiff entered upon his duties as care-taker for this defendant on the 1st day of October, 1895, and continued and remained in the employ of defendant up to and including November 4, 1899. * * * That it agreed to pay to said plaintiff for his said services the sum and price of four dollars per day, payable as follows: One-half of said sum, to wit, two dollars per day, payable at the end of each consecutive fourth week of service, and the remaining one-half, to wit, two dollars per day, payable at such a time as this defendant might resume operations of its business or dispose of its property. * * * That from the ―――― day of November, 1897, up to and including the 30th day of October, 1899, this plaintiff has received from the sales of merchandise and supplies belonging to this defendant, and from rents of property belonging to defendant, the sum of $605.05, which said sum

of money plaintiff has converted to his own use, without the consent of this defendant, and plaintiff is now indebted to this defendant in the full sum of $605.05, no part of which sum has been paid. * * * That at the time of the employment of this plaintiff, to wit, September 30, 1895, it was ever since then, and now is, the owner of, and in the possession of, those certain mines, mining claims, and mining property and appurtenances situate at Pittsburg, Lander county, Nevada. That ever since the employment of plaintiff by this defendant said mines * * * have remained and now are idle, and defendant at no time during the employment of said plaintiff either resumed operation of its business or disposed of its property,"—and prays judgment against the plaintiff for the sum of $605.05 and costs.

Plaintiff's employment commenced October 1, 1895, upon an oral agreement between himself and Mr. Hunter, agent of the defendant. On January 15, 1896, the plaintiff, in a letter addressed to R. H. M. Hill, secretary of defendant, said: "When I came here, a verbal agreement was made between Mr Hunter, as your agent, and myself. According to this agreement, I was to receive, as a recompense for faithful and conscientious services rendered the company, a salary of $4 per day, one half payable at the end of each consecutive fourth week of service, and the remaining half payable at such a time as the company might resume operations or dispose of the property. If agreeable to you, I would be pleased to receive a statement from yourself confirming this agreement." To this letter the plaintiff received a reply dated London, February 15, 1896, wherein Hill said: "The arrangement as to your salary is as stated in your letter of the 15th ultimo." It is admitted that plaintiff received payments, as per agreement, at the rate of two dollars per day, up to September 25, 1899, and that he has received no payment whatever since that date. On September 30, 1899, the plaintiff, in a letter sent to Mr. Hill, said: "To-day completes my fourth [year] of service for the Hampton Plains Exploration Co., Limited. I hereby announce my resignation from said company's employment, to take place not more than one year after date." On October 3, 1899, Hill, in a letter to plaintiff, said: "I have submitted your letters dated August 3d and September 12th and 13th to my directors, who are much surprised to find that you have been selling goods belonging to the company, and collecting moneys for these goods and rent, since November, 1897, and appropriating the same to your own personal use, and giving me no information whatever that these had been effected, and that the moneys had been received by you; this being a complete breach of the instructions contained in my letter to you of September 30, 1895. The salary arranged to be paid to you by my letter of that date has been regularly paid. Under the circumstances, my directors are compelled to at once cancel your employment, and have instructed Mr. J. B. Truman, of San Francisco, to proceed to Pittsburg, and to take charge of the property. I must request you, therefore, on the arrival of Mr. Truman, to hand over to him possession of everything belonging to the company." On November 4, 1899, the plaintiff wrote to Hill as follows: "I have to acknowledge the arrival here, on the 28th ulto., of Mr. J. L. Grimes. He came to take my place here. I am very sorry that I was compelled to refuse to deliver possession of the company's property over to him. As in your letter of instructions to me, announcing the appointment of Mr. Truman as your agent, you wrote of my salary being regularly paid, it seemed to me as the only consistent course left for me to follow was to remain here until a full investigation as to the terms of the contract of my employment, as made between Mr. Hunter, as your agent, and myself, could be made. * * * Even Mr. Grimes said that he and Mr. Truman both thought, from the correspondence forwarded to Mr. Truman by the company, that my full wages had been paid. If it had not been for this misunderstanding, I would gladly have turned over possession of the company's property to Mr. Grimes, although I am not sure that Mr. Truman had authority to depute his power as agent to another. As the matter stands at present, I think best to maintain possession until a complete understanding can be reached." On November 17, 1899, Hill wrote plaintiff, among other things, as follows: "I am in receipt of your letter of the 4th inst. Mr. Truman's letter to you of the 3d inst. clearly states the position of your engagement with this company. You were to be paid $2.00 per day, and you have been duly paid this. To the astonishment of my directors, it appears

that you have been collecting moneys for goods and rent on behalf of the company since Nov., 1897, and appropriating the same, giving no information that these moneys had been received by you. We quite admit you were to be paid an additional $2.00 per day in the event of the company resuming operations or disposing of the property. Neither of these events having happened. you are not entitled to receive more than $2.00 per day, and you are therefore a debtor to the company for $605.05, received and retained by you since Nov.. 1897. My directors consider your receiving and retaining these amounts is a serious breach of trust, and they must request that you will at once hand over possession of the property, together with the $605.05, which you have illegally and unwarrantably appropriated, to Mr. Truman or his nominee." On December 11, 1899, the plaintiff, in answer to this letter, after repeating the terms of the agreement, said: "When I entered the employ of your company, I supposed that the mine would be put and kept in a salable condition, but, contrary to my advice, the company have absolutely refused to do work of any kind in said mines. Although several parties have been here to inspect the mine during my stay here, their visits were productive of no results, because the mines had been kept in no condition for inspection. For a long time I have been convinced that no sale of the property could be made until some work was done in the mines, and it commenced to look as though the company were purposely reducing their property to an unsalable state. Of all moneys received from the rents of the company's buildings, and from merchandise and supplies sold. I have kept a true, exact, and faithful account. I have kept you fully informed as to the lengths of time for which I have been able to rent each and every one of said buildings, and of the amounts received for such monthly rentals. I was persuaded to retain and apply part of these amounts to my salary account because the money was due me, and because of the facts as aforesaid the said company would not authorize the putting of the mines into a salable condition, of the knowledge of the difficulties experienced by my predecessors in obtaining their just dues from the company, and also that I needed said money for my necessary expenses." On January 5, 1900, Hill replied as follows: "Your letter of the 11th ult. to hand. I must refer you to my previous letters, which accurately set out the terms of your employment by my company, and the improper way in which you have acted during such employment. My directors must insist that you hand over possession of the property, together with the balance of cash due from you, to Mr. J. B. Truman or his nominee." This closed the correspondence.

Plaintiff, during his employment, under authority from defendant, sold and disposed of certain personal property, and certain real estate, comprising the old Pittsburg mill site, for which the defendant executed a deed to the purchaser. The amount of money received by him from these sales was between $1,700 and $1,800, all of which was sent to Wells, Fargo & Co.'s Bank, as directed by defendant, with the exception of $674.11, which he applied on his salary account. Before plaintiff accepted the position of care-taker, and at the time of his employment, he was informed by defendant's agent that defendant had been reorganized. and all its properties consolidated, and that the operations would be resumed at the mine in a short time. If plaintiff is entitled to recover for the full time he remained in charge of the property. 1,612 days, at the rate of $4 per day, it would amount to $6,448. He received pay at the rate of $2 per day for 1,491 days, up to September 25, 1899, amounting to $2,982; he received from rents and merchandise, $674.11: total receipts. $3,656.11,—which would leave the balance due him of $2,791.89. If he is only entitled to $2 per day up to the time he was notified that the defendant would not longer retain him, he would be indebted to defendant in the sum of $674.11.

James F. Dennis, for plaintiff.
Torreyson & Summerfield, for defendant.

HAWLEY, District Judge (orally). The controversy between the parties is as to the actual number of days that plaintiff performed **work** for which he is entitled to recover, and whether the money,

over and above the amount plaintiff has received, is due under the terms of the contract. There is no conflict in the evidence as to the facts. It shows that there was no written contract at the time the plaintiff was employed; but after his employment by the agent of the defendant, at the rate of four dollars per day, there was more or less correspondence between the plaintiff and R. H. M. Hill, the secretary of the defendant, with reference to their understanding of the agreement. From the evidence in this case, I am of opinion that the terms of the agreement must be determined from the correspondence between the parties. This shows that plaintiff was employed and was to be paid for his services at the rate of four dollars per day; that he was to be paid "at the end of each consecutive fourth week of service" the sum of two dollars per day, and the balance of two dollars per day was to be retained as an earnest for faithful services up to the time defendant might resume operations of its business or dispose of its property, when the whole amount that was retained, as above stated, would become due and payable; that at the time of his employment it was the general understanding that the defendant would resume operations within a reasonable time, or use reasonable efforts to dispose of its property; that in the absence of any express declarations of the parties to that effect, there being no time specified within which operations should be resumed or property be sold, the law presumes that it was the intention of the parties that the contingencies mentioned should occur within a reasonable time. It certainly was not the intention that the defendant might, if it saw fit, so postpone the time, of its own volition, as to deprive plaintiff of his right to recover. Wolf v. Marsh, 54 Cal. 228, 232. Under the agreement between the parties in this case, the debt was absolute, but the time of its payment indefinite.

In Story, Cont. (5th Ed.) § 46, the author said:

"Where no time is fixed within which the condition shall be performed, the rule is that it must be performed within a reasonable time. Of course, no universal rule can be laid down, as to what constitutes reasonable time, which will apply to all cases. The only rule which can be stated is that any delay in the performance of the condition, which operates as an injury to the other party, will be considered as unreasonable. What is such a delay in any particular case must depend upon its peculiar circumstances."

See, also, Adams v. Copper Co. (C. C.) 7 Fed. 634, 638; Manufacturing Co. v. Hurd (C. C.) 18 Fed. 674, 675; Curtiss v. City of Waterloo, 38 Iowa, 266, 269; De Wolfe v. French, 51 Me. 420, 422; Button v. Higgins, 5 Colo. App. 167, 170, 38 Pac. 390.

Under the conditions, circumstances, and surroundings of this case, it is evident that four years would exceed the limit of a reasonable time.

In Nunez v. Dautel, 19 Wall. 560, 22 L. Ed. 161, the plaintiff, Dautel, on September 10, 1870, commenced an action against Nunez to recover the amount due on an instrument in writing as follows:

"September 1, 1865.

"Due Joseph Dautel or order, $1,619.66, being balance of principal and interest for four years and six months' services. This we will pay as soon as the crop can be sold or the money raised from any other source, payable with interest.                I. M. Nunez & Co."

The trial court instructed the jury to find for the plaintiff, and the correctness of this instruction was the only point raised on appeal. The court said:

"No time having been specified within which the crop should be sold or the money raised otherwise, the law annexed as an incident that one or the other should be done within reasonable time, and that the sum admitted to be due should be paid accordingly. Payment was not conditional to the extent of depending wholly and finally upon the alternatives mentioned. The stipulations secured to the defendants a reasonable amount of time within which to procure, in one mode or the other, the means necessary to meet the liability. Upon the occurrence of either of the events named, or the lapse of such time, the debt became due. It could not have been the intention of the parties that if the crop were destroyed, or from any other cause could never be sold, and the defendants could not procure the money from any other source, the debt should never be paid. Such a result would be a mockery of justice. Hicks v. Shouse, 17 B. Mon. 487; Ubsdell v. Cunningham, 22 Mo. 124. The question of reasonable time, as the case was presented, was one to be determined by the court. When the suit was instituted, more than five years had elapsed from the date of the instrument. This was much more than a reasonable time for the fulfillment of the undertaking of the defendants, and the plaintiff was entitled to recover."

In Williston v. Perkins, 51 Cal. 554, the defendants built a schooner at Vallejo, and employed laborers to whom they gave certificates for payment of certain days' work performed by them, "when the three-masted schooner now in course of construction by said association is sold." The court held that the defendants were entitled to only reasonable time in which to finish and sell the schooner, and, that time having elapsed, the plaintiff could maintain his action. In addition to the authorities heretofore cited, see Noland v. Bull, 24 Or. 479, 484, 33 Pac. 983; Randall v. Johnson, 59 Miss. 317; Crooker v. Holmes, 65 Me. 195, 199; Smithers v. Junker (C. C.) 41 Fed. 101, 7 L. R. A. 264.

The excuse sought to be established by the defendant to defeat the plaintiff's right of recovery herein, on the ground that he was guilty of a breach of trust, in this: that he had appropriated to his own use, without authority, the sum of over $600,—cannot be maintained. Every dollar that plaintiff collected was faithfully accounted for. The defendant having left the plaintiff in such a position that he found it necessary to apply this money on his salary account, in order to subsist until the financial questions were settled, it cannot be said that this appropriation of the money constituted such a breach as would justify the defendant in refusing to pay the balance due on the contract.

There is another view of this case, which is supported by the evidence, and based upon well-settled principles of the law, that are elementary in their character, which clearly entitles plaintiff to recover four dollars per day during the time that he remained in defendant's service under the contract. On October 3, 1899, November 17, 1899, and January 5, 1900, the defendant, through its secretary, notified plaintiff that it was compelled to cancel its agreement with him, and instructed him to turn over the property to its agent, Mr. Truman. By the orders contained in these letters, the plaintiff was discharged from defendant's service before it had "resumed operations or disposed of its property." By voluntarily discharging the plaintiff

without any just cause, the defendant made it impossible for him to remain continuously (as the agreement contemplated) in the defendant's service until "it resumed operations or disposed of its property," and the unpaid balance for his services, at the rate of four dollars per day, at once became due and payable, notwithstanding the fact that the contingencies mentioned for its payment had not occurred. This rule has been applied under the civil, as well as the common, law, under a great variety of conditions. In Angelloz v. Rivollet, 2 La. Ann. 652, the conditions of the contract entered into between the parties were that the plaintiff should accompany the defendant to New Orleans, and aid in recovering possession of the inheritance which had devolved upon her, and, as reward for his services, he was to receive a stipulated sum out of the succession. The evidence showed that the plaintiff was extremely attentive to his duties, and rendered promptly and cheerfully every service required of him by his employer. The defendant, however, became dissatisfied, without any sufficient cause, and resorted to various devices to disgust the plaintiff, and induce him to abandon her service. A few weeks after her arrival in New Orleans she informed the plaintiff, in terms by no means complimentary, that he was incapable of rendering her such services as she needed, that he could leave if so disposed, and that she intended to pay him nothing. Upon these facts the court said:

"The defense mainly relied upon in this court is that the action was premature; that, by the terms of the contract, the plaintiff was only to be paid after the succession of Girod had been settled, and the defendant had received her share. * * * This defense cannot avail the defendant. By her own acts she violated and put an end to the contract without just cause, and gave the plaintiff the right, immediately upon his discharge, to exact the entire amount of his wages. He was not required to await the settlement of Girod's succession before enforcing it."

It is a general principle of law, as was said by the court in Jones v. Walker, 13 B. Mon. 163, 165, "that he who himself prevents the happening or performance of a condition precedent, upon which his liability, by the terms of the contract, is made to depend, cannot avail himself of his own wrong, and relieve himself from his responsibility to the obligee, and shall not avail himself, to avoid his liability, of a nonperformance of such precedent condition, which he has himself occasioned, against the consent of the obligee."

The question remains as to the length of time for which plaintiff is entitled to recover. If Mr. Truman had appeared in answer to the letter of October 3, 1899, and demanded that the property be turned over to him, it would have been the duty of plaintiff to have promptly obeyed, and he would not have been entitled to recover any amount for his services after that time. But, from all the facts and circumstances presented herein, I am of opinion that it was his duty to remain until a duly-authorized agent appeared upon the ground, to whom plaintiff was required, by the orders of defendant, to deliver the property. This did not occur until October 28, 1899, when Mr. Grimes appeared at Pittsburg to take possession of the property. I have some doubt as to whether the reason given by plaintiff for not turning over the property to Grimes is sufficient to enable him to recover any pay for his services rendered after that date. One thing is certain, viz. that the letter of the defendant dated January 5, 1900,

is absolute, and that after its receipt plaintiff could not collect any pay for his services rendered after that time. I am, however, disposed to resolve the doubt herein expressed in favor of defendant, and shall, therefore, hold that plaintiff should have turned over the property to Mr. Grimes, and that he is not entitled to collect anything for his services after that date. This conclusion reduces the amount due plaintiff to the sum of $2,311.89, which amount he is entitled to recover.

Let judgment be entered for said amount, with interest thereon at the rate of 7 per cent. per annum, and costs.