## TEACHENOR v. TIBBALS.

No. 1742.    Decided August 3, 1906    (86 Pac. 483).

1. MINES AND MINING—CONTRACTS—EVIDENCE.—Evidence examined, and *held* to show. that sufficient ore had been extracted from a mine to have paid a balance due on the purchase price had the ore been sold.

2. SAME—LIABILITY FOR PURCHASE PRICE—CONSTRUCTION OF CONTRACT.—Defendant assumed an obligation to pay as the balance of the purchase price of a mining claim a certain sum out of the first net profits derived from the sale of ores thereafter extracted therefrom. An abundance of ore was extracted to have paid such balance out of the net profits thereof. *Held,* that defendant could not, by selling the mine before selling the ore, escape liability on the contract.

3. CONTRACTS — MAKING PERFORMANCE IMPOSSIBLE — LIABILITY. — Where one voluntarily puts it out of his power to do what he agreed to do, in the way agreed upon, he commits a breach of contract and becomes liable generally.

APPEAL from District Court, Salt Lake County; M. L. Ritchie, Judge.

Action taken by David W. Teachenor against William H. Tibbals. From a judgment dismissing the complaint, plaintiff appeals.

REVERSED AND REMANDED.

*A. L. Hoppaugh* for appellant.

*Henderson, Pierce Critchlow & Barrette* for respondent.

BARTCH, C. J.

This is an action upon contract to recover $318.75. It appears that on June 12, 1896, plaintiff being then the owner of 'an undivided one-fourth interest of the Liberal Lode mining claim, conveyed his interest therein to Thomas Ma-

rioneaux, for a consideration of $1,250, of which $400 were paid in cash. As to the balance, $850, the vendee, on the same day, made a written agreement with the vendor, which, so far as material here, reads as follows: "It is agreed that said first party [Marioneaux] will pay to the second party the additional sum of $850 out of the first net profits which may be derived by the first party from the sale of ores which may be hereafter extracted from said Liberal Lode mining claim; but said sum is not to be paid otherwise." Afterwards, H. C. Edwards negotiated with Marioneaux to purchase the interest, and, wishing defendant, Tibbals, to join him in the purchase, he explained the arrangements to him, and also the contract between Teachenor and Marioneaux. Tibbals then agreed to take three-eighths of Marioneaux's interest; and, at his suggestion, the property was deeded to one Doscher, as nominal owner, who was to convey to Edwards and Tibbals upon request. The deed was executed to Doscher on November 7, 1898, and the interest conveyed, subject to the aforesaid agreement. Tibbals, as shown in evidence, paid his share of the cash consideration, and agreed to pay three-eighths of $850, balance of the consideration, out of the first net proceeds of ore. On January 7, 1899, Doscher conveyed by quitclaim deed, subject to that agreement, the three-eighths interest to Tibbals. Thereafter, by quitclaim deeds dated October 26, 1899, and July 8, 1903, Tibbals and his associates conveyed for an express consideration of $30,-000 the property to the Chicago & Bingham Mining Company, a corporation; the former deed bearing acknowledgment February 21, 1900. The defendant never paid his share of the $850, claiming no net proceeds of ore accrued before he sold his interest to the corporation. The cause was tried without a jury, and the court made findings in harmony with the claims and contention of the defendant, and entered judgment against the plaintiff dismissing the complaint, and for costs.

Upon this appeal the decisive question relates to the finding of the court, respecting the net profits of the mine, while the defendant owned his interest. The finding on this point, so

far as material here, reads: "That between the 7th day of January, 1899, and the 8th day of July, 1903, there was extracted from said Liberal Lode mining claim ore of the value of $5,000, and that the cost of extracting said ore was the sum of $1,200; but how much thereof was extracted prior to February 21, 1900, is not shown by the evidence nor the cost of the extraction of said portion; and that no net profits were derived by the actual sale or disposal of ores from the said Liberal Lode mining claim during any of the time that said defendant was the owner of the part thereof belonging to him; but said ores after extraction remained upon the dump. That between July 8, 1903, and August 12, 1904, there was extracted from said mine ore of the value of $25,000 and that the cost of extraction and marketing the same was about one-fourth the value thereof, leaving net profits of about $18,000." The appellant contends that that part of this finding, where it is in effect found that there was no evidence to show how much ore was extracted prior to February 21, 1900, the date of acknowledgment of the first deed, from Tibbals and others, to the corporation, and that no net profits were derived from the disposal of ores during the time defendant owned his interest, is not in accordance with the proof and is erroneous, and that the court erred in refusing to enter judgment for the plaintiff.

Upon careful examination of the evidence in connection with the agreement referred to, we are of the opinion that this contention is sound. With reference to the extraction of ore and net proceeds, the witness Edwards testified, in part, as follows: "Between the 7th day of January, 1899, and the 8th day of July, 1903, there was in the neighborhood of $5,000 worth of ore extracted from the mine. The cost of extracting it was about $1,200. The value of the ore was $5,000. Between the 8th day of July, 1903, and the 3d day of August, 1903, there was $25,000 worth of ore extracted from the mine. It cost about one-fourth of the value of that to extract it and market it. There was about $18,000 net profits as I remember." And then, after stating that the $5,000 worth of ore taken out "was stacked up," the witness, on cross-examination, further testified: "No ore had been

sold or marketed, but there was a great deal in the mine and some on the dump. As to whether there were any net proceeds during Tibbals' time depends upon the construction placed on the words 'net proceeds.' I think there was. This $5,000 worth of ore was taken out of the Liberal Lode before July 8, 1903, during the spring of the year that Tibbals and Doscher held the title. Part of the ore was on the dump when it was sold to the new company, and the rest was stored in the mine. None of it had been marketed. Until we sold it to the company no profits had been derived from it. The company that bought from Tibbals took the ore and got the proceeds from that ore. He sold to the Chicago & Bingham Mining Company. That corporation took this $5,000 worth of ore, and they sold it to the Butler Liberal Mining Company. The company to whom Tibbals sold received the consideration for this ore from the Butler Liberal Mining Company. This testimony is uncontradicted, and, while witness states, in a general way, as found by the court, that the ore of the value of $5,000 was extracted between January 7, 1899, and July 8, 1903, still, he also states specifically that that ore was taken out of the Liberal Lode, "during the spring of the year that Tibbals and Doscher held the title," and that part of the ore was on the dump; when sold to the new company, and the rest stored in the mine. These statements as to time do not appear inconsistent with each other. The one simply designates a longer period within which the ore was extracted, while the other designates more particularly the time, within that period, during which the ore was extracted, and we perceive no reason why the court should not have found in harmony with both statements that the ore was extracted while Tibbals was the owner of his interest in the mine.

The finding that there were no net profits derived from an actual sale of ore may be accepted as correct, if by that is meant profits in cash, and yet that, under the circumstances here disclosed, can and ought not be held fatal to the plaintiff's recovery. Tibbals knew what Marioneaux's contract was, before he purchased his interest in the mine, and, according to the uncontradicted testimony of the plaintiff, told

the latter that "he would pay three-eighths of the $850," which amounts to what is involved in this suit. Having bought subject to that contract, he was bound by it the same as any other purchaser under it, and it would be clearly unwarranted, inequitable and unjust to hold that under the terms of the instrument, the purchasers could extract such vast amounts of ore, stack it up on the dump and in the mine, refrain from selling it and converting it into cash until they sold the mine, and then sell it and the mine for one lump sum; and, in that way, rid themselves of all liability, under the contract, for the purchase price. A construction of that instrument, which would countenance such a transaction, would be in contravention of every principle of justice and fair dealing between men. Can it be doubted that, when that agreement was made, the parties intended that the ore, as it was extracted, should be sold, without unreasonable delay, as is usual in the business of mining? We think not. Nor does anything appear from the context of the instrument to indicate that such was not the intention of the parties. It is clear that there was an abundance of ore extracted before the mine was sold, saying nothing of that which was extracted afterwards, to have paid out of the net proceeds thereof, if it had been sold, the balance of the purchase price, and, therefore, it is equally clear that the defendant cannot escape liability, under the contract, by his failure to insist upon the sale of the ore, and payment of balance, before sale of the mine to the corporation. He cannot escape liability by putting it out of his power to perform his contract in the particular way provided in the instrument. The law is that where one, as in this instance, voluntarily puts it out of his power to do what he agreed to do, in the way agreed upon, he commits a breach of contract and becomes liable generally. (*Wolf v. Marsh,* 54 Cal. 228; *Johnson v. Schenck,* 15 Utah 490, 50 Pac. 921; *Heard v. Bowers,* 23 Pick. [Mass.] 455; *Newcomb v. Brackett,* 16 Mass. 161; *Burton v. Shotwell,* 13 Bush [Ky.] 271; *McIntyre v. Ajax Min. Co.,* 20 Utah 323, 60 Pac. 552; *Buttrick v. Holden,* 8 Cush. [Mass.] 233; *James v. Burchell,* 82 N. Y. 108; *Reusens v. Mexican Nat. Const. Co.* [C. C.], 22 Fed.

522.) We do not consider it important to discuss any other question presented.

The judgment must be reversed, with costs, and the case remanded, with instructions to the court below to set aside its judgment, reinstate the complaint, and proceed in accordance herewith.

It is so ordered.

McCARTY and STRAUP, JJ., concur.