Appeal from Salt Lake County, Third District

## DUNYON v. SCRANTON MG. & S. CO.

### No. 3017. Decided October 31, 1917. (168 Pac. 755.)

1. MASTER AND SERVANT—CONTRACT OF EMPLOYMENT—CONSTRUCTION—
INTENT OF PARTIES. In determining whether a contract of employ-
ment was contingent as to the amount of compensation, or definite
as to the amount and only conditional as to the time of payment,
the controlling question is the intent of the parties at the time of
making the contract as gathered from the language used, the situa-
tion of the parties, and the subject-matter of the contract. (Page
613.)

2. CORPORATIONS—OFFICERS—COMPENSATION—CONSTRUCTION OF AGREE-
MENT. Plaintiff, a stockholder and director of a mining company
whose other officers were residents of Pennsylvania, was employed
as manager at a salary of $350 a month. At a time when the mine
was not paying expenses, and the other officers were advancing the
money for its operations, the president wrote plaintiff that he must
"look to you for help in deferred payment on a portion of your
salary of say $150," and that this back payment should not be
exacted by plaintiff or another employee until all interest was paid
and enough accumulated to meet current expenses. Plaintiff in reply
stated that he and such other employee were willing to accept the
proposition as to salaries as they had every confidence in the out-
come of the property. In a prior letter he had stated that he was
satisfied they had a big property, that it meant much to him to make
it a dividend payer, and that he would stake his reputation on the
outcome. After such correspondence he was paid $200 each month,
and $150 was carried and credited to him. The corporation for
more than a year thereafter did everything in its power to develop
ore in paying quantities, and only suspended operations when it
became impossible to longer advance the necessary money. *Held,*
that it was the intention that the withheld salary should not be paid
until and unless sufficient ore was found to pay the interest on the
indebtedness and to meet the current expenses, and the corporation
having made an honest and reasonable effort to carry out its part
of the agreement without finding ore in paying quantities, plaintiff
was not entitled to recover the additional part of his salary.[1] (Page
613.)

FRICK, C. J., dissenting in part.

Appeal from District Court, Third District; *Hon. M. L.
Ritchie,* Judge.

---

[1] *Johnson* v. *Geddes,* 49 Utah 137, 161 Pac. 910.

Action by N. A. Dunyon against Scranton Mining & Smelting Co.

Judgment for plaintiff. .Defendant appeals.

REVERSED.

*Dey, Hoppaugh & Fabian* for appellant.

*Howat, Macmillan & Nebeker* for respondent.

GIDEON, J.

The findings of the district court and the issues presented here are within the pleadings, hence no further reference will be made thereto.

The defendant corporation was organized about the year 1900, under the laws of this state. The plaintiff was a director of the corporation from its organization to the date of filing this action. During all of that time he was its manager and had control of its mining operations within this state. The president, treasurer, and other directors were residents of the state of Pennsylvania, and the books of the company, except the record kept by the secretary, were in that state. Up until the year 1906 plaintiff received a salary of $100 per month. In that year, in the development of the mine, large bodies of valuable ore had been blocked out and his salary was increased to $350 per month. That continued until July 1, 1913. During the latter part of 1912, and in the early part of 1913, the mine did not produce sufficient ore to pay the operating expenses, and numerous letters were written between the plaintiff, as manager, and Mr. T. G. Wolf, as president, in regard to the operation and development of the company's mine. On or about July 10, 1913, the president of the company wrote the plaintiff and expressed anxiety over the exploration work being done and its results, and also some doubt as to his financial ability to hold out until ore in paying quantities was found, and also advised the plaintiff that there was interest then due on overdue notes, and that the company could not meet such indebtedness. He also expressed disap-

pointment over the amount of money necessary to be advanced for the June pay roll. He then proceeded as follows:

"I must now look to you for help in deferred payment on a portion of your salary of say $150. This back payment should not be exacted by either you or Nebeker, until all interest is paid, and enough accumulated to meet current expenses. You know from my past action that it would not be expected unless absolutely necessary, and I hope you will accept it in proper spirit. The life of the company, in which we are all interested, is in danger, and we must all join in bridging over."

In response to that communication plaintiff replied under date of July 29, and among other things stated:

"Nebeker and myself are perfectly willing to accept the proposition you make as to salaries, as we both have every confidence in the outcome of the property."

Prior to that, on June 9, 1913, plaintiff had written Mr. Wolf, in answer to a letter from Wolf dated May 27, saying:

"As to myself will do anything that is satisfactory to you. Have made arrangements with Nebeker to take $100 per month and get the balance when we get the ore."

That correspondence constitutes the contract under which plaintiff continued in the employ of the defendant as its manager until November 1, 1914. During that time plaintiff continued to have general control and direction of the development work carried on at defendants' mine. At the end of each month the pay roll and statement of the expenses of that month were forwarded to a Mr. Knapp, treasurer of the company, at Scranton, Pa., and a check or draft was returned by the treasurer to the secretary at Salt Lake City to pay such pay roll and expenses. All moneys received from the sale of ore were remitted to the treasurer during that time. The money necessary to meet the monthly pay rolls and expenses was either loaned or advanced to the company upon the indorsement of Mr. Wolf and other officers of the company, and the record discloses that from July 1, 1913, to December 1, 1914, the expenses connected with the development work exceeded the income something like $20,000. In the month of

October, 1914, Mr. Wolf advised the plaintiff by letter that owing to the difficulty of obtaining money it would be necessary to curtail expenses, and on the 16th of that month wrote the plaintiff that he had talked the matter over with Mr. Knapp, the treasurer, and that a resolution had been passed by the directors fixing the plaintiff's salary at $100 per month from October 1, 1914. In answer to that letter the plaintiff wired Mr. Wolf that he could not accept the terms mentioned in the letter of October 16th and stated, "In case you dispose of my services * * * I will insist on immediate payment of back salary." Other correspondence was had between the parties concerning expenses and salaries and on November 23, 1914, Mr. Wolf, president of the company, wired plaintiff as follows:

"Suspend all operations at once for the winter. Sell all horses, at best prices, also engine if possible; arrange matters so that one watchman can take care of the property. Act at once pending receipt of letter. Pleased to receive suggestions. Financial conditions compel this."

As directed by that telegram the plaintiff stopped work on the mine, took an inventory of the property, disposed of a few items of personal property, procured a watchman to take charge of the mine and the property located thereon, and ceased his employment as such manager about the middle of December of that year. On the day following, to wit, Decem- 16, 1914, this suit was instituted to recover what is termed "back salary," or $150 per month from July 1, 1913, to November 1, 1914.

Trial was had before the court. Findings of fact and conclusions of law were made and entered and judgment rendered in favor of plaintiff. Defendant appeals. The question for determination is, Has plaintiff a right, under the facts and circumstances above outlined, to recover?

If plaintiff is entitled to recover it must be upon one of two theories: First, that the contract for his salary was for a fixed and definite amount and that the date of payment was left indefinite, and, as a result, defendant would be presumed to have contracted to pay the same within a reasonable time;

or, second, that the contract being definite as to the amount plaintiff was to receive and the date of payment being conditioned upon the happening of a future event, and the defendant having by its own act or conduct made the happening of that event an impossibility, then the amount became immediately due and payable. It may be conceded, under the authorities, that if the facts in this case—and there is not a disputed fact in the record—bring the plaintiff within either of the above propositions he is entitled to recover. Clearly he does not come within the first, and we do not understand that he seriously contends that he does. The chief contention of the respondent is that by reason of the president of the company suspending operations for the winter of 1914 he, by that act, rendered the happening of the contingency upon which the plaintiff would be entitled to recover impossible. Therefore, the amount of his salary being definitely fixed, the balance became due and payable, and he has the right to maintain this action.

Under such contracts, as in all other contracts, the controlling question is to determine, if possible, what was the real intent of the parties at the time of making the contract. In determining that question, the intention of the parties must be gathered from the language used, the situation        1, 2 of the parties, and the subject-matter of the contract as presented by the evidence. As stated, the written contract between these parties consists of the correspondence hereinbefore given. It is clear, it seems to us, considering the former relationship of the parties, the matter concerning which they were contracting, and the language used, that it was the intention of the parties to that agreement that the back salary should not ''be exacted'' until sufficient ore had been found to pay the interest on the indebtedness and to meet the current expenses. That seems to have been the proposition submitted by the president in his letter of July 10, 1913, and the one accepted by the plaintiff in his letter of July 29th. In that letter he ·stated:

''Nebeker and myself are perfectly willing to accept the proposition you make. as to salaries as we both *have every*

*confidence in the outcome of the property."*    (Italics ours.)

It is clearly deducible from that language that the plaintiff, in continuing his services for the company after July 1, 1913, did not expect to receive payment from any source unless ore was found of such quality and quantity as to pay the interest on the indebtedness and the current expenses. In fact, in his communication he bases his willingness to accept the proposition not upon the ability of the defendant company to pay unless it found ore; but, as he states, "we both have every confidence in the outcome of the property." In addition, plaintiff was in .charge, credited with knowing, and was supposed to know, much more than any of the other officers of the workings of the company's mine, how long it would take to find ore that would pay expenses, and in his letter of June 9, 1913, prior to the date of the letter which makes up the contract between the two parties, he says:

"I am satisfied we have a big property and if it is in my power I am going to find it and I am sure we are on the right road. The making of a dividend payer of it means more to me if not financially than it does even to you, and I will stake my reputation on the outcome of it if we can only hold out for a few months, and I do hope we will be able to find something before our money is exhausted."

All parties seem to have proceeded upon the theory of having confidence in the outcome of the property until the fall of 1914. Each month the plaintiff was paid $200 on his salary and $150 was carried and credited to him on what was designated the reserve account.

Respondent has cited numerous authorities sustaining in a general way the proposition contended for by him, and especially seems to rely upon the case of *Hood* v. *Hampton Plains Exp. Co.* (C. C.) 106 Fed. 408, which is probably the strongest case cited in support of his contention. Briefly, the facts in that case were that in October, 1895, the plaintiff there entered into a contract to become watchman for the property of the defendant at a salary of $4 per day, one half payable at the end of each consecutive fourth week, and the remaining half payable at such "time as the company [defendant] may

resume operations or dispose of the property.'' Plaintiff continued in that employ under that arrangement until the fall of 1899, at which time the property had not been sold nor operations resumed. He was discharged and a suit was instituted to recover the balance of his salary. There are two elements in that case, as found by the court, that are not present in this case, and which seem to control the court's decision:

(1) ''That at the time of his [plaintiff's] employment it was the general understanding that the defendant would resume operations within a reasonable time, or use reasonable efforts to dispose of its property; that in the absence of any express declarations of the parties to that effect, there being no time specified within which operations should be resumed or property be sold, the law presumes that it was the intention of the parties that the contingencies mentioned should occur within a reasonable time;'' (2) that the defendant in that case voluntarily discharged the plaintiff ''without any just cause'' and thereby ''made it impossible for him to remain continuously (as the agreement contemplated) in the defendants' service until 'it resumed operations or disposed of property.' ''

Apparently no effort was made on the part of the defendant in that action during all of the time to either operate the property or dispose of it, and the plaintiff performed his part of the agreement until, as the court found, he was discharged without any just cause. No such condition exists in this case. Mr. Wolf, president of the company, repeatedly wrote the plaintiff that he had the utmost confidence in plaintiff's judgment and regretted the necessity of suspending operations, even temporarily, but the financial conditions made such suspension absolutely imperative. In addition, it is in the record, and it is not disputed, that during all the time from June, 1913, to the termination of this contract, the defendant company did everything in its power to develop ore in paying quantities in its mine and only ceased to do so when it became impossible to longer advance the necessary money for that purpose. In other words, the defendant company

cannot be charged with not making an honest and reasonable effort to carry out its part of the agreement. Under such condition of affairs is it believable that at the time the parties made this contract in 1913 either one of them understood that if the company was unable to find ore the plaintiff would be entitled to recover the additional amount of his salary? If the respondent's theory is right, then the company was under the necessity of continuing the development work on its mine indefinitely, or, failing to do that, it would be mulcted for the unpaid part of plaintiff's salary. We do not believe any such agreement or understanding was in the contemplation of the parties. The law does not therefore impose a duty upon the defendant to pay plaintiff's claim. In *De Wolfe* v. *French,* 51 Me. 420, which we think is a correct statement of the law, it is said:

"If, in fixing upon the happening of a future contingent event as the time when money is to be paid, the parties intend to make the debt a contingent one, and the event never happens, the creditor's right to recover it will never accrue."

Furthermore, as stated in the beginning of this opinion, the plaintiff was a stockholder and director of the defendant company, and was, as such, jointly interested with the other officers of the company in its success, and he must have understood and known that the ability of the defendant to pay the money that the president and the other officers of the company were advancing or lending to the company in carrying on the development work was contingent wholly upon the success of the venture. It seems likewise clear that the plaintiff was willing to devote his time for a less consideration than he had been receiving, with the hope that he, too, would not only receive additional salary but that he would share in the profits of the mine if the company were fortunate in finding valuable ore, and if not, that they would all stand their share of the losses together. That is, in making this arrangement he took a sportsman's chance and, all parties to the agreement having sustained losses, the plaintiff should not be entitled to recover an unfair advantage.

The principles involved in this case, it seems to us, are almost identical with the questions decided by this court at the October term, 1916, in *Johnson* v. *Geddes,* 49 Utah, 137, 161 Pac. 910. It is true in that case, the contract stated definitely that the unpaid part of the purchase price was payable in the manner following, and not otherwise; that is, from one-half of the net proceeds of all ores mined upon the property after deducting the expenses of mining, etc., and further stated that "the extent and manner of managing and developing said property shall be left solely to the sound and reasonable discretion of said parties of the second part [defendants]." In effect, in this case, the contract of the parties was that, unless ore was found of sufficient value to pay the interest on the indebtedness and the running expenses, plaintiff should not demand or exact his back salary.

Should the defendant company in the future operation or development of this mine succeed in obtaining ore which will pay the running expenses and the interest on its indebtedness, nothing in this opinion should be construed so as to prevent the plaintiff from then recovering the amount of back salary payable to him under his contract.

In view of the foregoing conclusions the judgment of the district court, awarding plaintiff judgment, must be reversed. Such is the order. Plaintiff to pay costs.

McCARTY, CORFMAN, and THURMAN, JJ., concur.

FRICK, C. J. (dissenting in part).

As stated in the opinion of Mr. Justice GIDEON the question in this case is, What were the terms of the contract entered into between the company and the plaintiff respecting the payment of plaintiff's salary? When that is once determined nothing remains for the court to do save to enforce the terms of the contract in accordance with the settled principles of law applicable thereto.

The correspondence between plaintiff and Mr. Wolf, president of the company, is very voluminous, and large portions of it have little, if any, bearing on the principal question

involved here. The parts of the correspondence set forth by
Mr. Justice GIDEON in his opinion, and upon which he
bases his conclusions, are, in my judgment, hardly sufficient
to reflect the real intention of the parties to the transaction
involved here. It is no easy task for any one to select from
a large mass of correspondence a few excerpts which it may
be said contain and adequately reflect all of the terms and
conditions of a contract and the intention of the parties, as
such intention appears from the whole mass of correspondence
between them. Moreover, reasonable men can, and do, hon-
estly differ respecting just what should be excerpted for the
purpose of showing the real intention of the parties. While
there might be dissents from the following excerpts, and more
or less might be selected from the general mass of the corre-
spondence by others, yet, in my judgment, the real intention
of the parties may be gathered from the following excerpts.

The first letter referring to the reduction of the salary of
the superintendent of the mine was written by Mr. Wolf, the
president of the defendant company, to the plaintiff, the gen-
eral manager in charge of the mine, on May 27, 1913. Among
other things the president wrote:

"You mentioned some time since a reduction in Nebeker's
salary pending discovery of ore. While I regret suggesting
it at this time, I feel that it is necessary, and in view of your
keeping in close touch as you are doing and which I trust you
will continue to do, Nebeker has not the responsibility that
usually pertains to his position. In some way this reduction
could be made up to him as a bonus when we are again on
our feet."

Plaintiff answered that letter June 9, 1913. He, among
other things, said:

"And as to myself, will do anything that is satisfactory to
you. Have made arrangements with Nebeker to take $100
per month and get the balance when we get the ore."

On July 10, 1913, Mr .Wolf wrote the plaintiff, and in that
letter, for the first time, referred to plaintiff's salary. After
referring to the conditions prevailing at the mine and at
home he wrote:

"I must now look to you for help in deferred payment of a portion of your salary of say $150. This back payment should not be exacted by either you or Nebeker until the interest is paid and enough accumulated to meet current expenses."

Plaintiff, on July 29, 1913, answered Mr. Wolf's letter with respect to the salaries, saying:

"Nebeker and myself are perfectly willing to accept the proposition you make as to salaries, as we both have every confidence in the outcome of the property."

While much correspondence passed between plaintiff and Mr. Wolf after the foregoing letters were written, yet nothing material to the point in question was contained therein until a letter dated October 16, 1914, was written, wherein Mr. Wolf, again referring to salaries, for the first time mentioned a reduction of plaintiff's salary, in the following words:

"Have talked with Knapp and Warren about conditions at a meeting and it was 'resolved, that under present conditions that your salary from October 1st will be reduced to $100 per month, including expenses, and that Nebeker's salary from same date for constant services will be $125, the above being total salaries.' This was unanimously adopted. This we find under financial conditions to be absolutely necessary."

On October 22, 1914, following, plaintiff wired Mr. Wolf as follows:

"I cannot accept terms in your letter October 16th. In case you dispose of my services, as it seems you are trying to do, I will insist on immediate payment of back salary."

Two days thereafter, namely, on October 24, 1914, Mr. Wolf wrote a long letter in answer to the telegram in which he said:

"I will state here that if another arrangement is made by which you will remain, and I hope there will be, the excess salary will not be allowed, as I believe under the conditions it is unbusinesslike and unfair to those who have never received a cent from the property."

To that letter plaintiff replied on October 28, 1914, as follows:

"My proposition to you is this, I will dispense with Nebeker's services and attend to things myself until such time as

the mine warrants the getting of some one to help me, for $250 per month, and I believe I can more than earn this amount for you. Of course when the mine is in such condition that it can well afford to pay more I would expect an increase and feel that you would be willing to grant it."

Mr. Wolf answered that letter on November 9, 1914. In the course of his letter he wrote:

"There is no doubt that the resolution passed [which, by the way, is held here] can be changed by an increase to $150 from the amount named in the resolution, but this is the limit we can go in what I now look upon as exploration work."

That letter was followed by a telegram from Mr. Wolf to plaintiff dated November 23, 1914. That telegram reads:

"Suspend all operations at once for the winter. Sell all horses at best prices, also engine if possible, arrange matters so that one watchman can take care of property. Act at once pending receipt of letter. Pleased to receive suggestions. Financial conditions compel this."

On November 25, 1914, Mr. Wolf supplemented the telegram by letter, but, in my judgment, there is nothing in that letter which is material to the controversy. On November 29, 1914, plaintiff replied to the telegram and letter of Mr. Wolf as follows:

"Do you mean that I am to exercise supervision over things while the mine is closed down; that I am to receive $150 per month for it; or what do you mean? What arrangement do you think should now be made with reference to my back salary? A new element has been injected into the situation which would, for your accommodation, seem to call for a new arrangement respecting the payment of this back salary. I don't want to do anything unless I have to, for my protection, to make this matter any more burdensome to you than is necessary to keep me going. What kind of an arrangement do you want to make about this?"

Mr. Wolf, on December 7, 1914, wrote the plaintiff as follows:

"Nothing more than a nominal salary should attach to the position of manager, say $25 per month. More than this we

cannot do. Regarding back salaries, would refer you to my letter of October 21st. There are no back salaries due until the mine produces enough to pay the interest and indebtedness and a reasonable amount in the treasury for current expenses, as per my letter of July 10, 1913, and your acceptance for Nebeker and yourself July 29, 1913.''

I refrain from quoting further from the correspondence.

The mining company also produced its books in evidence from which it appears that each month, from July, 1913, to and including November, 1914, plaintiff was credited with the amount of the salary that had been agreed upon in 1906 and which had been paid to him regularly each month, to wit, $350. He was also debited with the amounts paid him on the foregoing salary as follows:

| | |
|---|---:|
| July, 1913 | $ 250 |
| August, 1913 | 150 |
| September, 1913 | 150 |
| October, 1913 | 150 |
| November, 1913 | 150 |
| December, 1913 | 200 |
| January, 1914 | 200 |
| February, 1914 | 250 |
| March, 1914 | 400 |
| April, 1914 | 200 |
| May, 1914 | 50 |
| June, 1914 | 300 |
| July, 1914 | 150 |
| August, 1914 | 200 |
| September, 1914 | 200 |
| October, 1914 | 300 |
| November, 1914 | 250 |
| Total | $3,550 |

It was thus conclusively proved by the defendant that from July, 1913, to and including November, 1914, plaintiff was credited with $5,825 on account of salary earned, while, during the same period of time, he was debited on account of salary only the sum of $3,550, leaving a balance unpaid according to defendant's books of $2,275. Plaintiff claimed an amount somewhat in excess of that, but that is immaterial now.

The matters contained in the books of the defendant company are material only as showing how the salary matter was regarded by the company. There is, therefore, no dispute regarding the fact that, while the plaintiff during all of the months aforesaid actually earned and was credited with a salary of $350 per month, he, nevertheless, was only paid at the rate of a little in excess of $208 per month during that period of time. From both the letters and the books of the company it is, therefore, manifest that it was clearly understood by both parties that the payment of $150 of plaintiff's $350 monthly salary should be deferred, and not that $200 was all the salary that plaintiff was earning during that period of time. The case, therefore, is not one where it is agreed between A. and B. that, in case a certain event or condition should happen, A. should be paid a salary of $350 a month, but, in case it did not happen, he should only receive a salary of $200 a month.

In this case plaintiff's monthly salary was fixed at the sum of $350 but the payment of $150 of that amount was to be deferred until such time as the defendant should realize sufficient from its mine to pay the interest on its obligations and the current expenses incident to the mining operations, including the deferred portion of plaintiff's salary. That such was the purport of the agreement in this case seems to me too clear to require further argument or elaboration. It is, however, also manifest from the correspondence that it was intended that the plaintiff should remain in the employ of the defendant company and that the company would continue to operate the mine with reasonable diligence and with a proper force in order to obtain sufficient money to pay the interest before mentioned and the current expenses of the mining operations, including that portion of plaintiff's salary which was left unpaid. That, to my mind, is clear from the letters written both by plaintiff and the president of the defendant company. That such was the intention is also apparent from the fact that the plaintiff expressed himself as having confidence in the mine, and hence, if the mining operations were continued, the unpaid portion of his salary would soon, or at

least within a reasonable time, be obtained from the mine. The president also expressed the same confidence in the mine and hence intended to obtain the money to pay the interest and the deferred salary from the mining operations. Both parties, therefore, intended that the mining operations should be continued indefinitely for the purposes aforesaid. Indeed, if the mining operations were discontinued the purposes expressed by both parties could, as a matter of course, not be fulfilled. To continue the working operations at the mine was, therefore, an essential part of the agreement and was the condition upon which plaintiff based his consent to defer the payment of a part of his salary each month. The question, therefore, is, What were the respective rights and duties of the parties to the agreement?

There can be no doubt regarding that phase of the case. It clearly was the defendant's duty to continue the mining operations in good faith and with reasonable diligence in order to realize the money for the purposes before stated. On the other hand it was the duty of plaintiff to assist the defendant in accomplishing that purpose and, to that end, give the company the benefit of his experience as a mining engineer and as a mining expert so that the mineral bearing veins of the mine might be properly explored to the end that sufficient pay ore might be developed to meet the interest on existing obligations and the current expenses, including the payment of plaintiff's deferred salary. If the defendant arbitrarily and without cause suspended the operations at the mine it clearly constituted a breach of the conditions of the contract which were clearly implied and constituted a part thereof the same as if they were expressed therein. Upon the other hand, if the plaintiff, without cause, refused to perform his part of the implied conditions before stated, his conduct would also constitute a breach of the contract. It may be asked however—and the question is pertinent— whether the defendant was required to continue operations at the mine forever under the conditions implied, as before stated. There is only one possible answer to this proposition, which is in the negative. The law only requires things that

are reasonable and capable of being performed. In view, however, that the defendant was constantly receiving a consideration in the form of services from the plaintiff it was required to make all reasonable efforts to continue operations at the mine and to continue them until it was manifest that the ores in the mine were exhausted, or that it was not possible with reasonable effort to obtain ore in paying quantities. The defendant was bound to act in good faith and make every reasonable effort to carry out the conditions of the agreement.

This case, therefore, falls clearly within the principle that if A. agrees with B. to discharge an existing obligation due or to become due to B. upon certain conditions, which are within the power of A. to carry into effect, but A., by his own conduct, puts it beyond his power to fulfill the conditions, or refuses to comply with a certain part of the agreement, whereby it becomes impossible for him to perform the conditions, B. need not wait for the happening of the conditions but may sue at once to enforce the contract, because A., by his acts and conduct, has breached the contract and has thus matured the obligation which, if he had complied with its terms, would not have matured until the conditions imposed thereby had happened, which might not have occurred until some time in the future. While the cases cited below are not cited as being strictly parallel, yet they clearly illustrate and apply the principle I have just stated. *Teachenor* v. *Tibbals*, 31 Utah, 10, 86 Pac. 483; *Marvin* v. *Rogers*, 53 Tex. Civ. App. 423, 115 S. W. 863; *Hall* v. *Northern & Southern Co.*, 55 Fla. 235, 242, 46 South. 178; *Nunez* v. *Dautel*, 19 Wall. 560, 22 L. Ed. 161; *Hood* v. *Hampton, Etc., Co.* (C. C.) 106 Fed. 408.

In *Teachenor* v. *Tibbals*, supra, the doctrine is stated in the headnote thus:

"Where one voluntarily puts it out of his power to do what he agreed to do, in the way agreed upon, he commits a breach of contract and becomes liable generally."

In *Marvin* v. *Rogers*, supra, the decision is correctly reflected in the headnote, and the rule is there stated in the following language:

"Where a contract is performable on the occurrence of a future event, there is an implied agreement that the promisor will place no

obstacle in the way of the happening of such event, and, if he prevents the happening of the event, the contract becomes absolute."

In *Hall* v *Northern & Southern Co.*, supra, the rule is stated thus:

"Where a bilateral contract is made for future performance, and before the time for performance arrives one party positively and unequivocally repudiates the entire contract, or voluntarily puts it out of his power to perform his part, the other party may treat the contract as rescinded. In many cases where the repudiation or voluntary act rendering performance impracticable is entire and absolute, actions may be brought as for a breach of the contract, even before the time for performance has arrived."

It is needless to either cite more cases or to quote from them, since the foregoing excerpts sufficiently illustrate the principle that I invoke. If, therefore, the defendant company had agreed to pay the deferred portion of plaintiff's salary "only at its convenience," he nevertheless could have enforced payment within a reasonable time if payment was refused. *Smithers* v. *Junker* (C. C.) 41 Fed. 101, 7 L. R. A. 264; *Works* v *Hershey*, 35 Iowa, 340.

Nor is anything that is said in the case of *Johnson* v. *Geddes*, 49 Utah, 137, 161 Pac. 910, contrary to the foregoing views. In that case the defendants had the choice of purchasing a certain mine at a certain price by paying the whole purchase price in money, or they could purchase the mine at an increased price, but if they did the latter a part of the purchase price could be paid out of the net proceeds derived from the mine. If they elected to purchase the mine at the increased price, however, they were not to become personally liable for $9,000 of the purchase price, but that sum was to be obtained from one-half of the net proceeds derived from the ores obtained from the mine. In that case the contract, however, expressly provided that in no event should the $9,000 be payable except from the net proceeds aforesaid. The principle of law that is stated in the cases I have first above cited was therefore expressly negatived in *Johnson* v. *Geddes*, supra. In other words, the parties there expressly covenanted and agreed that payment of the $9,000 in no event should be made or become payable except in a certain manner,

and in order that payment in that manner could be enforced a perpetual lien was created on the mine. In that case it was impossible to defeat payment of the $9,000 whether the mine was owned by the defendants or by anybody else, or whether the operations were continued or discontinued by the owners. If, at any time, net proceeds were derived from the mine, one-half thereof must be paid to plaintiffs or their successors by the then owners of the mine. If, however, the construction placed on the contract in question here by Mr. Justice GIDEON prevails, then it was and is possible for the defendant company, by its own act, to defeat payment of the deferred portion of plaintiff's salary at any time after the contract was entered into either by refusing to continue the mining operations or by selling the mine. The defendant could thus obtain the services of an expert mining engineer for an indefinite length of time and could at any time cease mining operations or dispose of the mine and thus prevent the accumulation of the money with which to pay the interest referred to by Mr. Wolf and to pay the deferred portion of plaintiff's salary. The defendant could thus, by its own act, defeat the happening of the condition upon which plaintiff should be paid the deferred portion of his salary. This the law does not permit. *Stockwell* v. *Gidney*, 73 Me. 84.

I have inserted a part of the correspondence which passed between the parties in the fall of 1914 for the purpose only of showing that it was not intended, until the letter of October 16, 1914, was written by Mr. Wolf, that the salary of plaintiff should be reduced. Before that letter was written no change had been contemplated respecting plaintiff's salary, except that the payment of a part thereof should be deferred. Plaintiff, however, never agreed to the reduction of his salary and hence nothing was settled in that regard when the relations between the parties were severed and this action was commenced. The fact that no reduction of plaintiff's salary was made until in the fall of 1914, and the fact that he was always credited with $350 each month are circumstances, which to my mind, go very far to confirm the construction I have placed on the agreement between the parties.

The only question remaining for consideration, therefore, is, What disposition should be made of this case? I am of the opinion that upon the record as it now stands the judgment is erroneous and should not prevail. As before stated, it is clear to my mind that both plaintiff and Mr. Wolf, the president of the company, intended to continue the mining operations indefinitely for the purpose of developing ore to meet the obligations and expenses referred to in the correspondence between them. While, as before pointed out, if the defendant company by its own act prevented the happening of the conditions on which plaintiff should be paid the deferred portion of his salary, such an act constituted a breach of the contract and gave plaintiff a right of action to recover the remainder of his salary, yet the question remains whether an act which might merely extend the time of payment, if done in good faith, would also have that effect. From all that appears from the correspondence between plaintiff and Mr. Wolf it was not intended to suspend mining operations permanently, but merely temporarily. The operations were to cease only for the winter of 1914. The order was not made until November 23, 1914, when winter had practically set in. So far as the order of Mr. Wolf is concerned the suspension was, apparently at least, merely temporary. In my judgment plaintiff had no right to construe that as a breach of the contract. The defendant was only required to use reasonable diligence and make reasonable effort to continue the mining operations. It was not required to do extraordinary or unreasonable things to continue them. If, therefore, there was any sufficient reason to suspend mining operations during the winter months of 1914-15, such suspension would not constitute a breach of the contract, and forthwith mature the obligation to pay the deferred portion of plaintiff's salary. There is nothing in the record which shows that the defendant did not in good faith, and that it did not have ample reason to, suspend mining operations for the winter. Indeed, I think the record clearly shows that the defendant had ample reasons for doing that. While, as before stated, the defendant cannot legally, by its own act, defeat the happening of the conditions,

yet it was not required to do unreasonable things. This action was commenced within a few days after the order of suspension of the work at the mine for the winter was made. In my opinion that order, standing alone as it does, did not constitute an act whereby the defendant made it impossible for the conditions on which plaintiff was to be paid his deferred salary to happen, and hence did not constitute a breach of the contract. The action was therefore prematurely brought and should not prevail. While it is true that defendant did not interpose a formal plea of abatement on the ground that the action was prematurely brought, yet it constantly insisted that plaintiff was not entitled to payment, and now insists that the judgment in his favor is erroneous. For the reasons stated it is clearly erroneous. In my opinion it is, however, not erroneous for the reasons advanced in Mr. Justice GIDEON'S opinion.

While the judgment should be reversed, it should, however, be reversed for the reasons I have stated, and the cause should be remanded to the district court of Salt Lake County, with directions to dismiss the action, but to do so without prejudice to a future action so that plaintiff may enforce payment of the deferred portion of his salary in case the defendant has made it impossible for it to comply with the conditions upon which it was to be paid.